**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**KAREN HERBOWY-HUBALEK,**

                                    **Plaintiff,**

        **v.**                                            **6:21-CV-43**
                                                          **(TJM/ATB)**


**LITHIA OF YORKVILLE–3, LLC,**
**LITHIA MOTORS, INC., and LITHIA**
**MOTORS SUPPORT SERVICES, INC.**

                                    **Defendants.**
_____

**THOMAS J. McAVOY,**
**Sr. U. S. District Judge**

### DECISION & ORDER

        Before the Court is Defendants' motion to dismiss Plaintiff's Complaint.  See dkt. #

5.  The parties have briefed the issues and the Court has determined to resolve the matter

without oral argument.

**I.      BACKGROUND**

        This case arises out of Plaintiff Karen Herbowy-Hubalek's employment with

Defendants Lithia of Yorkville–3, LLC, Lithia Motors, Inc., and Lithia Motors Support

Services, Inc.  Plaintiff alleges that Defendants violated her rights by sexually harassing her

and discriminating against her because of her disability.  She also alleges that Defendants

retaliated against her when she complained about this treatment.  She brings claims

pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with

1

Disabilities Act ("ADA"), and New York anti-discrimination law.

Plaintiff began working for the Defendants on October 1, 2018. Complaint ("Complt."), dkt. # 1, at ¶ 10. She served as a Dealership Accountant. Id. She alleges that she "was a qualified employee and performed her work satisfactorily." Id. at ¶ 23. Before she started working for the Defendants, Plaintiff "was disagnosed with Barrett's Disease, which is sometimes referred to as Barrett's Esophagus." Id. at ¶ 24. Plaintiff alleges that Barrett's Disease "is a physical impairment that substantially limits one or more of her major life activities, including but not limited to" Plaintiff's "eating, swallowing, and digesting." Id. The disease also "substantially impairs one or more major bodily functions, including, but not limited to," Plaintiff's "neck function and digestion function." Id. Because of her health condition, Plaintiff "would periodically suffer from chest pain, difficulty swallowing and digesting food properly (and therefore trouble eating), nausea and vomiting" when she ate. Id. at ¶ 25.

Before she started working for the Defendants, Plaintiff underwent gastric bypass surgery as part of her treatment for Barrett's Disease. Id. at ¶ 27. The surgery was successful "to some extent," but limitations to Plaintiff's major life activities continued. Id. Plaintiff needed "to continue treatment for her disability for the foreseeable future." Id. During the time period relevant to this case, Plaintiff "took various supplements to address or mitigate her . . . symptoms, including, but not limited to, low blood sugar and vitamin deficiencies caused by her disability." Id.

While Defendants were not aware of Plaintiff's health condition when they hired her, Defendants learned of that condition. Id. at ¶¶ 30-31. Defendants provided employees with lunches, but Plaintiff did not participate. Id. at ¶ 31. When asked by other employees

2

why she did not join the lunches, Plaintiff explained that "she had certain disability-related dietary restrictions." Id. Plaintiff alleges that her "disability was known throughout the office" and Defendants and their "employees perceived" Plaintiff "as disabled." Id. at ¶ 32.

Plaintiff took her supplements at work on or around January 4, 2019. Id. at ¶ 33. Such conduct was not unusual for Plaintiff; she "took these supplements routinely." Id. Defendants knew "that these supplements were related to her disability." Id. When other employees saw Plaintiff taking the supplements, "several" of them "began engaging in harassing and hostile behavior." Id. at ¶ 34. "[S]everal co-workers and managers began" to taunt Plaintiff. Id. Though she explained why she took the supplements, these co-workers and managers "shockingly accused her of taking illegal narcotics at work (which she clearly was not doing)." Id. Plaintiff found these allegations "deeply insulting." Id. at ¶ 35. She alleges that the allegation came "in an effort to embarrass and/or humiliate" Plaintiff "related to her disability in a public manner." Id.

Jason Jackson, Defendants' Finance and Insurance Manager, and two other employees, John Fry and Dustin Fuller, forced Plaintiff to remain in a downstairs location away from her desk "while other employees inappropriately searched through" Plaintiff's "personal items upstairs." Id. at ¶ 36. At the direction of Jackson, Fry, and Fuller, other employees "opened and searched through" Plaintiff's "purse, which was located at" her "personal desk." Id. at ¶ 37. Plaintiff did not provide permission for this search. Id. Plaintiff alleges that Defendants engaged in this conduct out of "an attempt to harass" the Plaintiff "because of her disability." Id. at ¶ 40. Accusing her of using narcotics, Plaintiff alleges, was both false and "clearly discriminatory and harassing in nature" because Plaintiff's "disability related symptoms . . . required her to utilize the supplements." Id. at ¶

3

41.

On January 8, 2019, Plaintiff attempted to contact Heather Lucia, one of her supervisors and manager of the Accounting Department, to express her concern about the harassment and discrimination she had allegedly faced. Id. at ¶ 42. Lucia was out of town. Id. Instead, Plaintiff contacted Karen Flynn, who was talent acquisition lead in the Human Resources Department. Id. at ¶ 44. Plaintiff described her disability and requested that she be able to take her supplements during the workday without facing harassment and hostility from her co-workers and managers. Id. Plaintiff contends that "[t]his request was supposedly granted." Id. at ¶ 45. Plaintiff also raised concerns about the search of her purse that had occurred recently.[1] Id. at ¶ 46. Plaintiff explained to Flynn that Jack, Fry, Fuller, and the others had harassed her because of her disability. Id. at ¶ 47. She alleges that she told Flynn that those persons had accused her of taking narcotics when they knew she was taking supplements. Id. These persons also went through her things without her permission. Id. Plaintiff told Flynn that they engaged in this conduct "in a clearly discriminatory and harassing manner." Id.

Flynn responded by telling Plaintiff to contact Cyrstal Guzzardo, Defendants' "HR

---

[1] From the context, the search of her purse appears to be the issue Plaintiff raised. The Complaint describes the issue she raised as "the discriminatory and harassing incident that she had been subjected to in the days prior." Complt. at ¶ 46. A pleading is insufficient when it "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action [.]" Ashcroft v. Iqbal, 556 U.S. 662, 678 2009). This allegation shades towards such a formulaic recitation and borders on the conclusory. Black's Law Dictionary defines conclusory as "[e]xpressing a factual inference without stating the underlying facts on which the inference is based." Bryan A. Garner, ed., BLACK'S LAW DICTIONARY (8th Ed.). Such formulaic pleading is not helpful to the Court. The Court would find more helpful a pleading that names the incident that was discriminatory and harassing rather than labels it as such.

4

Business Partner/PHR." Id. at ¶ 48. Flynn told Plaintiff she would forward Plaintiff's concerns to Guzzardo, but Plaintiff "did not receive any further communication from Ms. Guzzardo." Id. at ¶ 51.

Plaintiff alleges that Defendants did not investigate or address her concerns "in a meaningful manner." Id. at ¶ 52. The persons about whom she complained did not receive any "meaningful" discipline. Id. The harassment and discrimination did not end, but instead got worse. Id. On February 22, 2019, for instance, employees again went through Plaintiff's personal items, including her purse, without Plaintiff's permission. Id. Plaintiff alleges that this conduct came in retaliation for her complaints about discrimination. Id. Plaintiff further alleges that, around the same time, employees stole her personal items and hid them in different locations in the office. Id. She contends they went through her wallet, which contained personal and private information, including information concerning insurance and bank routing. Id. at ¶ 53. This conduct, Plaintiff claims, occurred because of her disability, since it "mimicked (and escalated) the prior harassment that had occurred after" Plaintiff "disclosed to other employees that she was taking disability-related supplements." Id. at ¶ 54. Plaintiff complained about this conduct to Geoff Gill, Director of Human Resources, but the company did not offer a "meaningful response." Id. at ¶ 55.

Plaintiff also alleges that some of Defendants' employees sexually harassed her and created a hostile environment. See ¶¶ 58-91. She complained to her employer, but Plaintiff contends the Defendants did nothing to address this conduct. Id. at ¶¶ 92-111. Other harassment from coworkers allegedly occurred, and Defendants did not take proper action in response to Plaintiffs' additional complaints. Id. at ¶¶ 112-118.

5

Plaintiff contends that the Defendants responded to her complaints by taking adverse employment actions against her.  Plaintiff alleges that after she complained about her treatment in the workplace, John Acosta, who worked as "EEO Investigator and H&D Consultant, as well as Employee Relations for the Company," at one point "suggested" that Plaintiff be "disciplined" through "an employee concern notice about alleged poor performance," even though Plaintiff "had not been issued any formal discipline" previously. Id. at ¶¶ 101, 119.  Plaintiff contends that this suggestion that she be disciplined came after she complained about discrimination and harassment.  Id. at ¶ 121.  Plaintiff received a written warning dated July 22, 2019 on July 24, 2019.  Id. at ¶ 124.  The warning alleged poor job performance.  Id.   Plaintiff contends that the Defendants purposefully dated the warning to July 22, 2019 as part of "a pretextual attempt to falsely make the discipline appear to have been written and issued two days prior (which was untrue)."  Id.

Irene Cooney, Plaintiff's supervisor, attended the meeting to discuss this warning. Id. at ¶ 125.  Plaintiff alleges that Cooney "smirk[ed]" and "laugh[ed]" when she issued the write up during" that "meeting."  Id.  Plaintiff alleges that "Cooney falsely claimed that she had previously counseled" Plaintiff "on some of the performance-related concerns[.]" Id. Plaintiff further alleges that Cooney had not done so.  Id.  Plaintiff avers that "the write up came as a complete surprise to her[.]" Id.  She contends that the warning "addressed new (false) issues that seemed to have been invented specifically to provide a pretext to issue retaliatory discipline."  Id.  Plaintiff raised these issues during the meeting, but Defendants still issued her the disciplinary "write up."  Id. at ¶ 126.

Defendants terminated Plaintiff's employment on August 27, 2019.  Id. at ¶¶ 136-137.  Plaintiff alleges that Defendants claimed her firing came as a result of "performance

6

issues." Id. at ¶ 138.  This claim, Plaintiff asserts, "was false." Id. at ¶ 140.  She alleges

that "[s]he had been performing her job in a satisfactory manner," and the firing came

instead because Plaintiff "had repeatedly raised protected harassment and discrimination

concerns." Id. at ¶ 140.  Moreover, Plaintiff alleges, Defendants ignored their own

progressive discipline policy when they fired her. Id. at ¶ 142.   Other employees who had

performance issues, but who were not disabled, had access to this discipline policy. Id. at

¶¶ 144-147.

Plaintiff's Complaint raises seven counts.  Count I alleges sexual harassment and

sex discrimination in violation of the New York State Human Rights Law.  Count II brings

the same claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq.

Count III alleges disability discrimination in violation of the Americans with Disabilities Act

("ADA"), 42 U.S.C. §§ 12101, et seq.  Count IV raises a disability discrimination claim

under the New York Human Rights Law.  Count V claims retaliation in violation of Title VII.

Cont VI alleges retaliation under the Human Rights Law.  Count VII raises a claim for

retaliation under the ADA.

Defendants responded to the Complaint by filing the instant motion to dismiss,

which is aimed only at the disability-discrimination and retaliation counts related to

disability.  Plaintiff responded in opposition.

## II.   LEGAL STANDARD

Defendants have filed a motion to dismiss certain of Plaintiffs' claims pursuant to

Federal Rule of Civil Procedure 12(b)(6).  Defendants argue that Plaintiff has not stated a

claim upon which relief could be granted, even if all factual allegations in the complaint

were proved true.  In addressing such motions, the Court must accept "all factual

allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor."  Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009).  This tenet does not apply to legal conclusions.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Id. (quoting Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007)).

## III.    ANALYSIS

Defendants seek dismissal of Counts III, IV, VI, and VII of Plaintiff's Complaint., the Counts that deal with disability discrimination and retaliation.  Defendants raise a number of grounds in their motion, which the Court will address in turn.

### A.    The ADA

"Under the ADA, a covered employer 'shall not discriminate against a qualified individual on the basis of disability in regard to . . . terms, conditions, and privileges of employment.'"  Fox v. Costco Wholesale Corp., 918 F.3d 65, 74 (2d Cir. 2019) (quoting 42 U.S.C. § 12112(a) (emphasis removed)).   "A plaintiff asserting a violation of the ADA must prove that: (1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of [her] disability or perceived disability."  Capobianco v. City of New York, 411 F.2d 47, 56 (2d Cir. 2005).  A person is disabled within the meaning of the statute when that person demonstrates "'(A) a physical

8

or mental impairment that substantially limtis one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.'" Widomski v. State Univ. of N.Y., 748 F.3d 471, 471 (2d Cir. 2014) (quoting 42 U.S.C. § 12102(2)).

**B.    Existence of Disability**

Defendants first argue that Plaintiff has failed to allege that she is disabled within the meaning of the ADA.  They argue that Plaintiff has failed to allege that her Barrett's disease substantially limits her in a major life activity and has therefore not alleged that she suffered from a disability protected by the ADA.

"[T]he ADA defines a disability as 'a physical or mental impairment that substantially limits one or more major life activities of such individual.'" Parada v. Banco Indus. de Venez, 753 F.3d 62, 68 (2d Cir. 2014) (quoting 42 U.S.C. § 12102(1)(A)).  "The existence of a disability must be determined on a 'case-by-case' basis."  Capobianco, 442 F.3d at 56 (quoting Toyota Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002)).  "For purposes of determining whether an ADA plaintiff is a 'qualified individual with a disability,' the ADA defines 'disability' to include, *inter alia*, 'a physical or mental impairment that substantially limits one or more major life activities.'" Hamilton v. Westchester Cty., 3 F.4th 86, 92 (2d Cir. 2021) (quoting Woolf v. Strada, 949 F.3d 89, 93 (2d Cir. 2020) (in turn citing 42 U.S.C. § 12102(1)(A)).  "To determine whether a major life activity is substantially limited by an impairment" a court considers "among other factors, 'the nature and severity of the impairment; its duration or expected duration; and the existence of any actual or expected or permanent or long term impact.'" Jones v. New York City Transit Auth., 838 Fed. Appx.

9

642, 644 (2d Cir. 2021) (quoting <u>Capobianco</u>, 422 F.3d at 57).

While courts formerly interpreted "disability" narrowly, Congress amended the ADA in 2008 to "[broaden] the definition of 'disability'" in the statute.  <u>Id.</u>  Those amendments "'overrule[d] the Supreme Court's arguably narrow interpretation of what constitutes an ADA-qualifying disability as set forth in *Sutton v. United Air Lines, Inc.,* and *Toyota Motor Mfg., Ky, Inc. v. Williams*, and to make clear that the substantial-limitation requirement in the definition of 'disability' is not an exact one.'" <u>Id.</u> (quoting <u>Woolf</u>, 949 F.3d at 94.  To meet this aim, the ADA amendments provide "that '[t]he term substantially limits shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA,' and 'is not meant to be a demanding standard.'" <u>Id.</u> (quoting 28 C.F.R. § 35.108(d)(1)(i)).  The amendments also directed courts that "the term 'substantially limits' is to be interpreted and applied to require a lower degree of functional limitation than the standard required prior to the" amendments.  <u>Id.</u>

Defendants contend that Plaintiff has alleged only that her Barrett's disease restricts her diet, which is not a substantial limitation within the meaning of the ADA.  According to Defendants, Plaintiff has not alleged any facts about the severity of her condition, the frequency of her symptoms, or how such symptoms limit her ability to work.  According to the Defendants, Plaintiff only alleges that she needs to take dietary supplements, but does not contend that taking such supplements limits any life activity.  Plaintiff responds that Defendant's arguments ignore the 2008 amendments to the ADA.  Plaintiff claims that the limits to her life activities the Complaint alleges are sufficient to qualify her as disabled.  Defendants reply that the limitations Plaintiff's Complaint described are not substantial, even under the terms established by the 2008 Amendments.

The dispute here is whether Plaintiff has alleged facts sufficient to make plausible that she is disabled within the meaning of the ADA.[2]  Plaintiff alleges that she suffers from "Barrett's Disease . . . a physical impairment that substantially limits one or more of her major life activities, including but not limited to . . . eating, swallowing, and digesting." Complt. at ¶ 24.  She further alleges that Barrett's Disease limits "major bodily functions," among them "neck function and digestion function."  Id.  Because of that disease, Plaintiff "periodically" experiences "chest pain, difficulty swallowing and digesting food properly (and therefore trouble eating), nausea and vomiting" when she eats.  Id. at ¶ 25.  Gastric bypass surgery, undertaken before Plaintiff began her employment with Defendants, seemed to limit some of these symptoms, Plaintiff alleges.  Id. at ¶ 27.  Still, "the limitations on" her "major life activities continued," as did treatment for the disease.  Id.  That treatment included the need to take supplements to limit conditions like "low blood sugar and vitamin deficiencies."  Id.  Plaintiff's disease prevented her from eating the meals the Defendant provided to employees.  Id. at ¶ 31.

The ADA provides that "major life activities include, but are not limited to, caring for oneself, performing major tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(a)(2)(A).  In addition, such major life activities "[include] the operation of a major bodily function, including but not limited to, functions of the

---

[2]The Court notes that granting the motion under these circumstances–where Defendant contends that Plaintiff has not pled facts sufficient to meet the "plausibility" standard–would cause the Court to grant the motion with leave to file an amended complaint.  Nothing in either party's papers indicates that Plaintiff could not meet the plausibility standard by pleading more facts.

immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatoy, endocrine, and reproductive functions." 42 U.S.C. § 12102(a)(2)(B). The regulations implementing the ADA provide that "[a]n impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.  An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(ii).  Still, not all impairments cause a substantial limitation and constitute disabilities within the ADA's meaning.  Id.

Recognizing that the Defendant's move to dismiss a pleading and that no evidence has yet been collected, the Court finds that Plaintiff has alleged facts sufficient to make plausible that her Barrett's disease substantially limits a major life activity.  While Plaintiff's pleading, as described above, contains conclusory elements that invite the Court to adopt legal conclusions as facts, the Court also finds that Plaintiff has sufficiently alleged the nature of her condition and the limitations to major life activities that the condition causes to avoid dismissal.  She contends that she suffers from a disease that, even with treatment, continues to limit her ability to eat, swallow, and digest food, as well as her ability to move her neck.  Making all inferences in her favor, Plaintiff also alleges that her medical condition causes periodic nausea and vomiting, as well chest pain.  She alleges that these are serious issues.  In light of the broadening of the definition of disability provided by the Congress, the Court concludes that collecting evidence is necessary before a fact-finder can determine whether Plaintiff actually suffers from a disability.  The Court will therefore deny the motion in this respect.

### C.    Regarded as Disabled

As explained above, federal law provides that a person qualifies as an individual with a disability under the ADA when an employer "regards" that person as disabled.  42 U.S.C. § 12102(2).  This provision exists "on the premise that 'society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment.'" Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003) (quoting Sch. Bd. of Nassau County v. Arline, 480 U.S. 273, 284 (1987)).  After the 2008 amendments, a plaintiff can demonstrate that her employer regarded her as disabled by showing that "'an action (e.g. disqualification from a job, program or service) was taken because of an actual or perceived impairment, *whether or not* that impairment actually limits or *is believed* to limit a major life activity.'" Hilton v. Wright, 673 F.3d 120, 129 (2d Cir. 2012) (quoting H.R. Rep. No. 110-730, pt. 1, at 14 (2008) (emphasis in original)).  A plaintiff relying on this provision need not prove that the defendant perceived her as having an impairment that substantially limited a major life activity, but only needed to show that the employer perceived her as having a physical or mental impairment.  See Rodriguez v. Vill. Green Realty, Inc., 788 F.3d 31, 49 n.18 (2d Cir. 2015).

Defendants argue that Plaintiff has not alleged facts sufficient to make plausible that they regarded her as disabled.  While Defendants agree that Plaintiff need not allege that her employer perceived her as substantially limited from a major life activity because of her disability, they argue that Plaintiff has admitted that Defendants were not aware of any disability.  While some fellow employees made comments about Plaintiffs' diet, Defendants contend that Plaintiff had not alleged that any manager perceived her as disabled.

13

Plaintiff alleges that Defendants were not aware of her disability at the time they hired her.  Complt. at ¶ 30.  She further alleges that she told fellow employees about her dietary restrictions when they asked why she did not take part in the lunches provided by Defendants.  Id. at ¶ 31.  She also contends that her "disability was known throughout the office and the Company and its employees perceived" her "as disabled."  Id. at ¶ 32.

The Court will deny the motion in this respect as well.  While the allegation that the Defendants "perceived Plaintiff as disabled" is clearly conclusory, the Plaintiff also alleges that her particular health condition was known throughout the office where she worked.  Making all inferences in Plaintiff's favor, the Court reads her allegations to be that her health condition was widely known by many at the Company, including supervisors and other decision makers.  The Court finds these allegations sufficient to make plausible that Defendants perceived her as suffering from an impairment.

### D.    Adverse Employment Action

Defendants further argue that Plaintiff has failed to allege that she suffered an adverse employment action.  They contend that Plaintiff has alleged only that some co-workers made offensive comments regarding her use of supplements and that she was detained in an office while other employees searched her purse for illegal drugs.  Plaintiff responds that she has alleged she suffered discrimination and harassment because of her disability, and that she complained about such treatment without receiving a response from her employer.  She also contends that she complained about mistreatment because of her disability, to which Defendants responded by cutting her overtime hours.

"To qualify as an adverse employment action, the employer's action toward the plaintiff must be 'materially adverse' with respect to 'the terms and conditions of

14

employment.'" Davis v. New York City Dep't of Educ., 804 F.3d 231, 235 (2d Cir. 2015)

(quoting Sanders v. N.Y.C. Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004)).   "An

adverse employment action 'must be more disruptive than a mere inconvenience or an

alteration of job responsibilities and might be indicated by a termination of employment, a

demotion evidenced by a decrease in wage or salary, a less distinguished title, a material

loss of benefits, significantly diminished material responsibilities, or other indices . . .

unique to a particular situation.'" Fox v. Costco Wholesale Corp., 918 F.3d 65, 71-72 (2d

Cir. 2019) (quoting Patrolmen's Benevolent Ass'n of City of New York, 310 F.3d 43, 51 (2d

Cir. 2002)).   "Harsh reprimands do not rise to the level of adverse employment action

where there is no tangible effect on employment."  Id. at 72.  Similarly, "[a]ctions that are

'trivial harms'–i.e., 'those petty slights or minor annoyances that often take place at work

and that all employees experience'–are not materially adverse."  Tepperwien v. Entergy

Nuclear Operations, Inc., 663 F.3d 556, 568 (2d Cir. 2011) (quoting Burlington N. & Santa

Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).  Courts do not have a "bright-line rule to

determine whether a challenged employment action is sufficiently significant to serve as

the basis for a claim of discrimination."  Davis, 804 F.3d at 235.

    Plaintiff complains of a number of materially adverse actions by her employer in her

Complaint.  For example, she alleges that supervisors "began to deny" her "overtime

assignments," and that such actions "reduced [her] pay compared to both her prior typical

compensation levels, as well as the pay she would have received if she had been allowed

to work more overtime."  Complt. at ¶ 80.  At the time she began to see less overtime,

other workers continued to receive such assignments.  Id.  The same supervisor also

denied Plaintiff's requests to take paid time off.  Id. at ¶ 82.  The supervisor provided no

"meaningful justification" for these restrictions.  Id.  Other employees received permission to take time off.  Id.  The supervisor also limited the flexibility in Plaintiff's schedule that she had previously enjoyed.  Id. at ¶ 83.  On August 27, 2019, Defendants terminated Plaintiff's employment.  Id. at ¶ 139.

The Court finds that the actions described above, which include limits in hours that led to lost pay, refusals to let Plaintiff use paid time off she had earned, assignments to less favorable hours, and termination from her position, all amount to adverse employment actions.  To prevail on her claim in the end, however, Plaintiff would also need to show that she "suffered an adverse employment action because of [her] disability or perceived disability."  Capobianco, 411 F.2d at 56.  She would need to demonstrate that "disability was the 'but for' cause of the adverse action."  Piligian v. Icahn Sch. of Med. at Mt. Sinai, 490 F.Supp.3d 707, 717 (S.D.N.Y. 2020) (quoting Natofsky, 921 F.3d at 349).  Making all inferences in Plaintiff's favor, the Court concludes that Plaintiff has adequately alleged that her disability caused Defendants to take adverse employment actions.  For instance, while Defendants claimed they fired Plaintiff due to poor job performance, Plaintiff contends that she had been doing her job in a "satisfactory way" and that her firing came because of her disability. Complt. at ¶ 140.  She also alleges that, unlike her, non-disabled employees received an opportunity to participate in the company's written job-improvement policies and were not terminate when they had similar alleged performance issues.  Id. at ¶¶ 143-147.  Further, Plaintiff alleges that, rather than addressing her concerns about discrimination based on her disability, the Defendants instead limited her overtime and paid leave.  Id. at ¶¶ 74-77, 80, 82-83.

Defendant argues that:

> While Plaintiff claims that she was reassigned work, denied overtime, given reduced
> hours, denied requests for [paid time off] and criticized for her performance as a
> result of her disability, according to her own Complaint, these allegations all
> occurred *after* she reported the alleged sexual harassment to her new supervisor,
> Irene Cooney, whom she has not alleged was aware of any claimed disability.
> Docket No. 1, ¶¶ 79-85.  The Complaint fails to allege any facts that connects [sic]
> the Plaintiff's claimed disability with any of the alleged adverse actions.  As she has
> failed to allege any connection between her alleged disability and any adverse
> employment [action], the Plaintiff's disability claims [should be dismissed].

The Court finds this reading of the Complaint too narrow.  First, read generously, Plaintiff

did allege that Cooney was aware of her claimed disability.  Plaintiff alleges that, beginning

in April 2019, she "began to contact" Cooney, "and repeatedly raised protected concerns

about the ongoing harassing, discriminatory, and/or retaliatory behavior" she had

undergone.  Id. at ¶ 72.  Just because Plaintiff suffered sexual harassment and complained

about it does not mean she also failed to complain about discrimination related to her ADA.

When read in context and by making all inferences in Plaintiff's favor, the issues Plaintiff

raised to Cooney related to disability and well as to harassment.  Plaintiff has alleged

enough of a connection between her alleged disability and the adverse employment

actions she faced to permit discovery to examine these questions.

    The Court therefore finds that Plaintiff has sufficiently alleged a disability-related

adverse employment action and will deny the motion in this respect as well.

    E.    Retaliation

    Defendants next seek dismissal of Plaintiff's retaliation claims.  They contend that

Plaintiff has not alleged that she suffered any adverse employment action in a time period

close to when she complained about mistreatment because of her disability and has

therefore failed to state a claim.  Plaintiff contends that she has alleged a sufficient

connection between adverse employment actions and her complaints about discriminatory

and harassing action related to her disability to support her claim.

"The ADA makes it unlawful for an employer to 'discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.'" Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (quoting 42 U.S.C. § 12203(a)). "A plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful 'so long as [s]he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'" Id. (quoting Sarno v. Douglas Ellman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999)). To make out a retaliation claim in this context, Plaintiff must allege that "[s]he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against [her]; and (4) a causal connection exists between the alleged adverse employment action and the protected activity." Id.

Here, Defendants focus on the fourth element of a retaliation claim, arguing that Plaintiff has failed to plead sufficient facts to make plausible a causal connection between her protected activity and the adverse employment actions she suffered. To make out a prima facie case on this element, a plaintiff "must show that the allegedly adverse actions occurred in circumstances from which a reasonable jury could infer retaliatory intent." Treglia v. Town of Manlius, 313 F.3d 713, 718 (2d Cir. 2002). At the pleading stage, a plaintiff need only "sustain a minimal burden of showing facts suggesting an inference of discriminatory motivation[.]" Littlejohn v. City of New York, 795 F.3d 297, 311 (2d Cir. 2015) (emphasis in original). A plaintiff can show this "causal connection . . . either (1) indirectly,

18

by showing that the protected activity was followed closely by discriminatory treatment, or

through other circumstantial evidence such as disparate treatment of fellow employees

who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus

directed against the plaitniff by the defendant.'" Id. at 319 (quoting Gordon v. N.Y.C. Bd. of

Educ., 232 F.3d 111, 117 (2d Cir. 2000)).

Defendants acknowledge that Plaintiff complained about discrimination on the basis

of her alleged disability, and that she has alleged adverse employment actions.  They

simply contend that the adverse employment activities were too distant in time from

Plaintiff's complaints to permit any sort of inference of retaliatory intent.  The Court finds

that reading of the Complaint to be too narrow and to make inferences in the Defendants',

not the Plaintiff's, favor.  The Defendants ask the Court to conclude from the facts alleged

in the Complaint that Plaintiff stopped complaining about discrimination on the basis of her

disability once she started complaining about the sexual harassment she allegedly

suffered.  The Court reads the Complaint to allege that Plaintiff complained about both

types of discrimination in the events here alleged.  Plaintiff alleges, after all, that she "had

been continuously subjected to discriminatory, sexually harassing, and otherwise harassing

behavior and, despite raising protected concerns to the Company, this unlawful behavior

had gone unremedied."  Complt. at ¶ 76.  Further, she "continued reporting and raising

additional protected concerns to HR (specifically to Ms. Cooney) based on the continuing

harassing treatment that" Plaintiff "was subjected to."  Id. at ¶ 77.  The alleged retaliatory

actions followed these continuing complaints, and those allegations create a sufficient

inference of discrimination to permit discovery on the issue to occur.  Whether a sufficient

causal connection exists to permit recovery is a question to be answered later in the

19

litigation.  The motion will be denied in this respect as well.

       **F.**    **New York State Human Rights Law**

       Defendants also seek dismissal of Plaintiff's claims brought pursuant to the New York Human Rights Law.  They argue that the Court should dismiss those claims because New York law and the ADA operate on the same principles.   Since "New York State disability discrimination claims are govered by the same legal standards as federal ADA claims," and the Court has denied the Defendants' motion with respect to the ADA claims, the Court will deny the motion in this respect as well.  Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d 113, 116 n.1 (2d Cir. 2004).

**IV.**    **CONCLUSION**

       For the reasons stated above, Defendants' motion to dismiss, dkt. # 5, is hereby DENIED.

**IT IS SO ORDERED**

Dated:  December 20, 2021

Thomas J. McAvoy
Senior, U.S. District Judge