UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KAREN HERBOWY-HUBALEK,

                              Plaintiff,

                  v.                              6:21-CV-43
                                                  (FJS/MJK)
LITHIA OF YORKVILLE – 3, LLC; LITHIA
MOTORS, INC.; and LITHIA MOTORS
SUPPORT SERVICES, INC.,

                              Defendants.
_____

APPEARANCES                          OF COUNSEL

LAW OFFICES OF WYATT &               BENJAMIN J. WYATT, ESQ.
ASSOCIATES, PLLC                     KATHERINE GABRIEL, ESQ.
17 Elm Street, Suite C211            MICHAEL VARRASO, ESQ.
Keene, New Hampshire 03431
Attorneys for Plaintiff

MONACO COOPER LAMME &                CAITLIN A. GOETZ, ESQ.
CARR, PLLC                           CLAUDIA A. RYAN, ESQ.
1881 Western Avenue, Suite 200
Albany, New York 12203
Attorneys for Defendants

SCULLIN, Senior Judge

## MEMORANDUM-DECISION AND ORDER[1]

### I. BACKGROUND

        Plaintiff was employed as a dealership accountant with Defendant Lithia Motors, Inc.

She claims that she suffered discrimination because of her disability and sexual harassment while

_____

[1] All references to page numbers of documents in the record are to the page numbers that the Court's Electronic Filing System generates and can be found in the upper right corner of those pages.

working at a Honda dealership in Yorkville, New York, that Defendants owned, and that

Defendants retaliated against her when she complained about that discrimination.  Plaintiff

asserts claims for discrimination and retaliation under the New York State Human Rights Law

("NYSHRL"), N.Y. Exec. L. § 296, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. §§ 2000e, *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101,

*et seq.  See, generally,* Dkt. No. 1, Complaint.  Plaintiff seeks compensatory and punitive

damages.  *See id.*  Pending before the Court is Defendants' motion for summary judgment.[2]  *See*

Dkt. No. 32.

---

[2] The parties filed voluminous statements of material facts as the Local Rules require.  The Court
will cite to those statements, as appropriate, in addressing the parties' arguments.  In reply to
Plaintiff's response to the instant motion, Defendants argue that the Court should disregard the
"additional statement of material facts" submitted with Plaintiff's response.  Defendants argue
that Plaintiff's additional statement, which contains 101 pages and 310 paragraphs, is excessive
in its length and contains mostly quotations from depositions, which do not create material facts.
The Local Rules permit Plaintiff to file "a short and concise Statement of Additional Material
Facts in Dispute, containing separately numbered paragraphs, followed by a specific citation to
the record where the fact is established."  Local Rule 56.1(b).  The opposing party is permitted to
respond to that statement of additional facts.  *See id.*  The Court agrees with Defendants that
Plaintiff's additional statement was too long and consisted largely of quotations from the
depositions that were already part of the record.  The Court will not, however, strike the
statement.  Defendants were able to craft responses to the contentions of fact contained in the
additional statement, and the Court is capable of using the statement in crafting a fair decision.
The Court reminds Plaintiff's counsel, however, that the quality (or usefulness) of papers that an
attorney produces does not correspond to the quantity of those papers.  For similar reasons, the
Court will decline Defendants' request to strike Plaintiff's memorandum of law in opposition for
failure to comply with the Local Rules in regard to length, margins, and font size in footnotes.
Although the Court cautions Plaintiff not to attempt to skirt the Local Rules by making extensive
legal arguments in footnotes and manipulating margins, the Court finds that Plaintiff's arguments
are helpful in resolving this matter and that Defendants had an adequate opportunity to respond
to them in their own briefing.  Thus, the Court will treat Plaintiff's memorandum of law as if it
had contained a request for an extension of page limits and grant that request.

## II. DISCUSSION

**A.     Legal standards**

It is well-settled that, on a motion for summary judgment, the Court must "construe the evidence in the light most favorable to the non-moving party," *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine if the relevant "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence to establish the existence of a factual dispute that a reasonable jury could resolve in her favor. *See Matsushita Elec. Indus. Co., LTD. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "A party opposing a properly supported motion for summary judgment may not rest upon' mere allegations or denials' asserted in his pleadings, *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)." *Doe v. Syracuse University,* 457 F. Supp. 3d 178, 193 (N.D.N.Y. 2020).

**B.      Plaintiff's disability discrimination claim**

Defendants argue that the Court should grant their motion for summary judgment as to Plaintiff's claims of disability discrimination and retaliation because no evidence exists by which a jury could find that Plaintiff was disabled or was perceived by her employer as being disabled. Alternatively, Defendants claim that, even if such evidence did exist, no evidence exists to support her claim that she faced discrimination or retaliation on the basis of her disability.

Plaintiff alleges that she suffered discrimination because of a disability.  "[T]o establish a prima facie case of discrimination under the ADA, a plaintiff must show (a) that h[er] employer is subject to the ADA; (b) that [s]he is disabled within the meaning of the ADA or perceived to be so by h[er] employer; (c) that [s]he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) that [s]he suffered an adverse employment action because of h[er] disability." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008) (citation omitted).  Courts interpreting claims of employment discrimination under the ADA follow the burden-shifting framework that the Supreme Court set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998).  Under this framework, the "plaintiff must initially come forward with facts sufficient to establish a *prima facie* case that h[er] discharge was effected under circumstances giving rise to an inference of discrimination." *Id.*  Once plaintiff meets her burden, "the burden of production then shifts to the defendant, who must proffer a legitimate, non-discriminatory reason for its actions in order to rebut the presumption of unlawful discrimination." *Id.* (citation omitted).  If the employer meets its burden to "articulate an explanation that, if true, would connote lawful behavior," the burden then returns to "the plaintiff

to persuade the factfinder that the employer's proffered explanation is merely a pretext for its intentional discrimination." *Id.* (citations omitted).

### 1. Plaintiff's alleged disability

Defendants first challenge whether Plaintiff is disabled within the meaning of the ADA. Defendants contend that Plaintiff's alleged disability, Barrett's Disease, that caused her to undergo gastric bypass surgery which left her with digestive system issues that require her to take vitamins and supplements throughout the day, does not substantially limit a major life activity. Plaintiff's issues, Defendants claim, "cause no more than a minor inconvenience. *See* Dkt. No. 32-45, Defendants' Memorandum of Law at 14. Plaintiff's medical records do not contain a record of limitations on working, and an expert employed by the Defendants "opined that Plaintiff has no limitations as it related to her ability to work or perform her job functions." *See id.* (citing Dr. Chait Affidavit). Plaintiff responds that her condition substantially limits a major life activity – eating and digesting food, as well as engaging in vigorous exercise. *See* Dkt. No. 35-1, Plaintiff's Memorandum of Law at 35.

The parties agree that Plaintiff underwent gastric bypass surgery in 2011 for Barrett's Esophagus Disease. *See* Dkt No. 32-44, Defendants' Statement of Material Facts in Support of Summary Judgment ("Defendants' Statement"), at ¶ 149. Defendant Lithia Support Services, Inc. hired Plaintiff as a Dealership Accountant on October 1, 2018. *See id.* at ¶ 5. She worked in the Accounting Department at Carbone Yorkville Honda, owned by Defendant Lithia of Yorkville-3, LLC. *See id.* at ¶ 6. Plaintiff did not provide Defendants with documentation of this medical condition upon being hired. *See id.* at ¶ 150.

Plaintiff alleges in an affidavit she submitted with her opposition to Defendants' motion,[3] however, that, after her gastric bypass, she "continued to experience long term complications related to [her] digestive system and other bodily systems[.]"  *See* Dkt. No. 35-4, Plaintiff's Affidavit, at ¶ 7.  During the time Plaintiff was employed by Defendant, and since, Plaintiff has had difficulty "consum[ing] anything larger than small meals at one time," and she "could not consume more than a small amount of liquid in one sitting."  *See id.* at ¶ 8.  After eating, Plaintiff "need[ed] to engage in some level of physical activity (such as a light walk) to help [her] digest [her] food properly."  *See id.*  Failing to do so could cause Plaintiff to "experience significant pain, discomfort, and vomiting."  *See id.*  Eating "certain foods, (especially rich, high fat foods)" can cause Plaintiff to "become seriously ill (resulting in vomiting and extreme nausea)."  *Id.* at ¶ 9.  Plaintiff's "dietary restrictions" lead to frequent "hypoglycemia (significant fluctuations in [her] blood sugar levels) . . . hypotension (an abnormally low blood pressure), and vitamin deficiencies (that require [her] to take long term supplements for treatment)."  *See id.* at ¶ 10.  Plaintiff's "difficulty digesting certain foods" prevents her from "extract[ing] the vitamins from food that a typical person's digestive system would be able to absorb."  *See id.* at ¶ 11.  Without supplemental vitamins, Plaintiff could face "major health problems" due to a lack of vitamins and nutrients.  *See id.*  Plaintiff's health condition "periodically result[s] in headaches, dry mouth, diaphoresis (sudden, cold sweats), and a decreased oxygen flow to the brain."  *See id.* at ¶ 12.

Defendants provide an affidavit from Maxwell M. Chait, M.D.  *See* Dkt. No. 32-43, Maxwell Chait Affidavit ("Chait Affidavit").  Dr. Chait has a New York medical license and is

---

[3] Defendants argue that the Court should disregard Plaintiff's affidavit in whole or in part as contradicting her sworn deposition testimony.  They do not, however, argue that Plaintiff's affidavit contradicts her sworn deposition testimony in relation to her claims about her health conditions and the limits on life activities she claims those health conditions cause.

Board Certified in Internal Medicine.  *See id.* at ¶ 1.  Defendants' law firm engaged Dr. Chait to do a "record review of the Plaintiff['s] . . . medical records and provide a report."  *See id.* at ¶ 2. Dr. Chait states that his review of the records reveals that Plaintiff has "GERD, which is a very common problem affecting up to 27.8% of adults in the United States and short segment Barrett's esophagus, but her symptoms are well-controlled with diet and omeprazole."  *See id.* at ¶ 3.  Dr. Chait also provides an expert report.  *See* Dkt. No. 32-43, Exhibit B to Chait Affidavit, at 22-24. His report examines Plaintiff's treatment for GERD and short segment Barrett's esophagus.  *See id.* at 23.  He finds that Plaintiff "has symptoms of GERD which are well controlled with diet and medication as documented by her gastroenterologist.  In the majority of patients GERD with and without short segment and it carries no significant limitations as to work environment."  *See id.*

Plaintiff has had only limited medical care related to her GERD and Barrett's esophagus. *See* Defendants' Statement at ¶ 159.  She did not receive any treatment between 2014 and 2018. *See id.*  A follow-up in September 2018 found no recurrence of Barrett's esophagus and only mild symptoms of gastro-esophageal reflux without esophagitis.  *See id.*  Medical records do not show any limitations.  *See id.*  At the time of her deposition, Plaintiff had not had any follow-up since 2018 with regard to the condition.  *See id.*  Plaintiff does not dispute this evidence exists but responds that she denies "that this implies Plaintiff does not experience long-term complications requiring ongoing treatment and case [sic] related to her digestive system and other bodily systems from her disability and the disability-related surgical procedure (the gastric bypass procedure)."  *See* Plaintiff's Response at ¶ 159.  She cites to her own affidavit for this claim and does not provide any additional medical documentation.  *See id.*

Plaintiff argues that this evidence supports a finding that she is disabled within the meaning of the ADA.  Her health issues, she claims, substantially limit her in the major life

activities of eating and digestive functions.  *See* Plaintiff's Affidavit at ¶ 13.  Under the ADA, a

"'disability'" is "a 'physical or mental impairment that substantially limits one or more major life

activities of such individual[.]'"  *Morey v. Windsong Radiology Group, P.C.*, 794 F. App'x 30, 32

(2d Cir. 2019) (summary order) (quoting 42 U.S.C. § 12102(1)).  Federal Regulations provide

that "[m]ajor life activities include, but are not limited to: (i) Caring for oneself, performing

manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting,

bending, speaking, breathing, learning, reading, concentrating, thinking, communicating,

interacting with others, and working[.]"  29 C.F.R. § 1630.2(i)(1)(i).  Such major life activities

also include "[t]he operation of a major bodily function, including . . . digestive, genitourinary,

bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic,

lymphatic, musculoskeletal, and reproductive functions."  29 C.F.R. § 1630.2(i)(1)(ii).  Such an

impairment constitutes a disability within the meaning of the ADA "if it substantially limits the

ability of an individual to perform a major life activity as compared to most people in the general

population."  29 C.F.R. § 1630.2(j)(1)(ii).

Although courts formerly interpreted "disability" narrowly, "Congress passed the ADA

Amendments Act (the "ADAAA")" in 2008 to "[broaden] the definition of 'disability' under the

ADA."  *Hamilton v. Westchester Cty.*, 3 F.4th 86, 92 (2d Cir. 2021).  The purpose of that

amendment "'was to overrule the Supreme Court's arguably narrow interpretation of what

constitutes an ADA-qualifying disability set forth in *Sutton v. United Air Lines, Inc.*, and *Toyota*

*Motor Mfg., Ky., Inc. v. Williams*, and to make clear that the substantial-limitation requirement in

the definition of "disability" is not an exacting one.'"  *Id.* (quoting *Woolf*, 949 F.3d at 94

(footnotes omitted) (citing the ADAAA, Pub. L. No. 110-325, § 2(b), 122 Stat. 3553, 3554)).  To

meet this end, the ADA amendments provide that "'[t]he term "substantially limits" shall be

construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA,' and 'is not meant to be a demanding standard.'"  *Id.* (quoting 28 C.F.R. § 35.108(d)(1)(i)).  The amendments also directed courts that "the term 'substantially limits' is to be interpreted and applied to require a lower degree of functional limitation than the standard required prior to the ADAAA."  *Id.* (citing 28 C.F.R. § 35.108(d)(1)(vi)).

Although under this standard "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.  Nonetheless, not every impairment will constitute a disability within the meaning of" the ADA.  29 C.F.R. § 1630.2(j)(1)(ii).  "To determine whether a major life activity is substantially limited by an impairment, we consider, among other factors, 'the nature and the severity of the impairment; its duration or expected duration; and the existence of any actual or expected permanent or long term impact.'"  *Ibela v. Allied Universal*, No. 21-1995-cv, 2022 U.S. App. LEXIS 12155, *3-*4 (2d Cir. May 5, 2022) (quoting *Capobianco v. City of New York*, 422 F.3d 47, 57 (2d Cir. 2005) (citing 29 C.F.R. § 1630.2(j)(2)).  Since "'[n]ot every impairment that affects an individual's major life activities is a *substantially* limiting impairment,'" courts examining disability claims "'have been careful to distinguish between impairments which merely *affect* major life activities from those that *substantially limit* those activities[.]"  *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 160 (2d Cir. 2016) (quoting, in turn, *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 151 (2d Cir. 1998) (quoting *Knapp v. Nw. Univ.*, 101 F.3d 473, 481 (7th Cir. 1996)), and *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir. 1998) (parenthetical omitted))).  Thus, a plaintiff "must 'show that any limitations are in fact substantial, not amounting to only a mere difference in conditions, manner, or duration.'"  *Id.*

(quoting *Bartlett v. New York State Bd. of Law Exam'rs*, 226 F.3d 69, 80 (2d Cir. 1998) (quotation marks omitted)).

To determine whether Plaintiff has a disability within the meaning of the ADA, "the court follows a three-step process to determine: (1) whether plaintiff had an impairment; (2) whether the impairment affected a 'major life activity' within the meaning of the ADA; and (3) whether that major life activity was substantially limited by the impairment." *Mazza v. Bratton*, 108 F. Supp. 2d 167, 173 (E.D.N.Y. 2000) (citing *Bragdon v. Abbott*, 524 U.S. 624, 631, 118 S. Ct. 2196, 141 L. Ed. 2d 540 (1998)) (other citation omitted). The Court agrees that Plaintiff has pointed to an impairment that limits major life activities as defined in the regulations. The evidence Plaintiff points to indicates that her Barrett's Esophagus disease and the complications from her gastric bypass surgery have caused limitations in the areas of eating and digesting food, which can lead to issues with absorption of nutrients and minerals from food. Those difficulties can, in turn, cause Plaintiff to experience issues with regulating blood sugar or blood pressure, and they require her to take certain supplements to address those issues. Drawing all inferences in Plaintiff's favor, a reasonable juror could conclude that she suffers from an impairment that limits the major life activities of eating and digestion.

Plaintiff must also produce evidence, however, from which a reasonable juror could conclude that her physical impairments substantially limit those life activities. Drawing all inferences in Plaintiff's favor, the evidence outlined above indicates that Plaintiff must (1) eat frequent small meals; (2) only drink small amounts of liquid at one time; (3) walk after eating to aid digestion; (4) not eat certain rich foods; and (5) must take supplements to avoid complications from these limitations on her ability to eat and digest food. Plaintiff states that her impairments cause frequent hypoglycemia, hypotension, and vitamin deficiencies that force

Plaintiff to take supplements to prevent adverse consequences.  The evidence also indicates that, as a result of her impairments, Plaintiff also suffers from "periodic" headaches, dry mouth, sudden, cold sweats, and decreased oxygen flow to her brain.  As a result of her health conditions, Plaintiff could not participate in the lunches that Defendants provided workers during the day.  *See* Plaintiff's Affidavit at ¶ 16.  Plaintiff often took her required supplements at work.  *See id.* at ¶ 18.

The Court finds that Plaintiff has failed to point to record evidence that a reasonable juror could use to support her claim that she has a disability.  Although Plaintiff has provided the Court with evidence that she suffers from medical conditions that affect her ability to eat and digest food, she has not produced any evidence, particularly any medical evidence, that demonstrates the severity of those restrictions and the medical consequences of them.[4]  The Second Circuit has stated that

> [n]either the ADA['s] . . . text, nor the respective implementing regulations require medical evidence to establish a genuine dispute of material fact regarding the impairment of a major life activity at the summary judgment stage.  Instead, *Toyota Motor [Manufacturing Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002)]* requires "[a]n individualized assessment" to determine the existence of a disability.  *Toyota Motor*, 534 U.S. at 199, 122 S. Ct. 681.  Medical testimony may be helpful to show that an impairment is substantially limiting, but it is not always necessary.

_____

[4] Plaintiff, who was not required to do so, has not produced any medical records for the Court's review.  Defendants have produced limited medical records, as well as the above-referenced expert report.  *See* Dkt. No. 32-44, Exhibit FF.  Those records indicate that Plaintiff underwent an upper GI endoscopy on September 19, 2019.  *See id.*  She received a diagnosis of gastro-esophageal reflux disease ("GERD") without esophagitis."  *See id.*  The physician reported that "she has mild symptoms and has not had long Barrett's.  *See id.*  Plaintiff has "Barrett's esophagus without dysplasia."  *See id.*  Although this evidence is not determinative as to whether Plaintiff suffers from an impairment that substantially limits a major life activity, the findings do nothing to support such a claim.

*Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 43 (2d Cir. 2015) (citing *E.E.O.C. v. AutoZone, Inc.*, 630 F.3d 635, 643-44 (7th Cir. 2010); *Head v. Glacier Nw., Inc.*, 413 F.3d 1053, 1058-59 (9th Cir. 2005)).

"[N]on-medical evidence that conveys, in detail, the substantially limiting nature of the impairment may be sufficient to survive summary judgment. *Id.* at 44. Plaintiff's problem, here, however, is that she has not provided such detailed information. On the record here, a jury lacks information to determine the frequency and severity of the consequences of Plaintiff's impairments. Without such information, Plaintiff cannot establish that she faced substantial limitations on the major life activities of eating and digesting and is left to rely on Plaintiff's claims that she must eat frequent small meals, drink small amounts of liquid at one time, walk after eating to aid digestion, avoid certain foods, and take supplements. Plaintiff does not provide any evidence about the severity of any intestinal issues she faces, nor does she provide any evidence of the severity of any hypoglycemic or low-blood pressure events.[5] Without such information, a reasonable juror cannot make a determination that Plaintiff's limitations are substantial.

Plaintiff cites to *Vargas v. Fla. Crystals Corp.*, No. 16-81399-CIV-MARRA, 2019 U.S. Dist. LEXIS 231571, *40-*41 (S.D. Fla. May 13, 2019) for the proposition that "'gastrointestinal problems and GERD, including painful gastritis, difficulty swallowing food, nausea, vomiting after eating, and diarrhea' arguably substantially limited Plaintiff's ability to eat." *See* Dkt. No. 35-1 at 35 n.66. In *Vargas*, the plaintiff raised a retaliation claim under the ADA after she sought

---

[5] Defendants also argue that their expert report establishes that Plaintiff's limitations are not substantial and that Plaintiff has offered no evidence that contradicts these findings. As explained, Plaintiff is not required to produce her own expert, but she must produce sufficient evidence for a reasonable juror to conclude that her limitations are substantial. Her testimony on this issue is vague and unsupported by any other evidence in the record, which does not allow her to avoid summary judgment in this respect.

an accommodation for a disability and then suffered an adverse employment action.  *See id.* at *38-*39.  Citing Eleventh Circuit law, the court found that "[a] plaintiff engages in statutorily protected activity in requesting an ADA accommodation if she 'had a good faith, objectively reasonable belief that [s]he was entitled to those accommodations under the ADA.'"  *Id.* at *39 (quoting *Standard [v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318,] 1328 [(11th Cir. 1998)]).  Applying the more-lenient standard of the amended ADA, the court concluded that "the evidence raises a genuine issue of disputed fact as to whether Plaintiff had a good faith, objectively reasonable belief that her impairment substantially limits a major life activity."  *Id.* at *41.  The court described the plaintiff's medical condition as follows:

> Since March or April 2014, Plaintiff has suffered from gastrointestinal problems and GERD, including painful gastritis, difficulty swallowing food, nausea, vomiting after eating, and diarrhea. . . . Plaintiff underwent one or two 24-hour periods of time where she could not leave the bathroom due to excessive vomiting and diarrhea. . . . Due to the side effects she experienced from eating solids, Plaintiff often consumed just liquids, such as broth. . . . In addition, Plaintiff "had several instances where [she] soiled [her]self because [she] was too far from the restroom." . . . Indicative of the severity of her gastrointestinal issues, Plaintiff was admitted to the hospital via the emergency room for gallbladder issues on May 4, 2015 and stayed there over the course of two days from May 4, 2015 at 2:03 p.m. to May 6, 2015 at 5:08 p.m. . . .

*Id.* at *41-*42 (internal citations omitted).

Beyond the fact that the question here is whether Plaintiff's impairments substantially limit a major life activity, not whether Plaintiff reasonably perceived that they did, the limitations that Plaintiff's impairments caused her in the daily activity of eating are significantly less severe than the limitations caused by the *Vargas* plaintiff's GERD and intestinal difficulties.  Plaintiff has not produced any evidence of extreme gastric distress, frequent diarrhea that caused her to soil herself, an inability to eat solid foods altogether, or hospitalization related to her condition.

Although she references episodes of hypoglycemia and low blood pressure, she has not produced any evidence of the severity of those episodes. She has not offered any evidence that those episodes caused her to require emergency medical treatment or caused her to miss work or any other daily activities. *Vargas* does not support Plaintiff's position that her impairments substantially limited her eating or digesting.

Plaintiff also cites to *Franchi v. New Hampton Sch.*, 656 F. Supp. 2d 252 (D.N.H. 2009), for the proposition that a plaintiff who alleges that an eating disorder substantially limits the major life activity of eating has sufficiently alleged she suffered from a disability. *See* Dkt. No. 35-1 at 35 n.67. In *Franchi*, the plaintiff alleged that the defendant, a boarding school, had discriminated against his daughter, CF, in violation of the ADA and Rehabilitation Act when the school expelled her after she received inpatient treatment for an eating disorder but returned to school and continued to lose weight. *See Franchi*, 656 F. Supp. 2d at 255-56. The plaintiff claimed that CF's expulsion violated school rules because no evidence existed to support a finding that CF was a danger to herself or others. *See id.* at 256. Citing to the ADA amendments, the court rejected the defendant's "argument that Franchi ha[d] not adequately pled that CF's eating disorder 'substantially limited' her eating so as to constitute a disability under the ADA[.]" *Id.* at 258. The court noted that "[t]he amended complaint states that, after spending six straight weeks in outpatient and inpatient eating disorder clinics from late November 2007 to early January 2008, CF nevertheless lost nearly five pounds in the subsequent 16-day period, dropping her weight to 93 percent of its ideal total" and found that "[t]hese allegations state a claim that CF's eating disorder substantially limited her eating[.]" *Id.* at 258-59.

*Franchi* is no more persuasive than *Vargas*. In *Franchi*, the court pointed to a condition that caused dangerous weight loss, hospitalization, and inpatient treatment. CF's mental

impairment so substantially limited her ability to engage in the daily activity of eating that she required extensive and emergency treatment to protect her from the consequences of that limitation. Moreover, *Franchi* decided a motion to dismiss, where the plaintiff's obligation was to present allegations that made plausible CF suffered from a disability, not evidence a reasonable juror could use to conclude that CF faced substantial limitations to her ability to eat. In this case, Plaintiff, who opposes a motion for summary judgment after all the record evidence has been collected, has not produced any record evidence of such consequences from the restrictions on her eating. She has produced evidence of discomfort and changes in her eating patterns. A reasonable juror could only conclude that Plaintiff's impairments affect her ability to eat. That same juror could not find that the impairments substantially limited that ability.

Plaintiff could still make out an ADA claim if she could show that she was "regarded" as disabled. "The ADA defines disability to include 'being regarded' as having 'a physical or mental impairment that substantially limits one or more major life activities.'" *Whitehead v. UPS, Inc.*, 387 Fed. App'x 16, 18 (2d Cir. 2010) (summary order) (quoting 42 U.S.C. § 12102). "Thus, a plaintiff 'is regarded "as disabled" within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more life activities.'" *Id.* (quoting *Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 521-22, 119 S. Ct. 2133, 144 L. Ed. 2d 484 (1999)). Defendants argue that no evidence exists which a reasonable juror could use to find that they regarded Plaintiff as disabled.[6] Plaintiff does not respond to this

---

[6] Defendants allege in their statement of facts that "[t]here is no evidence or testimony that any of the Lithia Support Services employee[s] or any employees of any of the defendants, including Irene Cooney and David Guilbeault, perceived the Plaintiff to have a disability of any kind." *See* Defendants' Statement at ¶ 160. Plaintiff responds that she denies this statement "in that it implies Plaintiff did not disclose her disability-related conditions (including disability-related supplements) as well as the fact that she underwent a disability-related surgery . . . Likewise, Plaintiff raised concerns about the disability harassment on several occasions . . . Plaintiff

argument.  Even if she had, the Court would find that no evidence exists to support a claim that Defendants regarded Plaintiff as substantially limited in any major life activity.

The Court must, therefore, conclude that Plaintiff has failed to provide evidence sufficient to support a claim that she is disabled, or was perceived to be disabled, within the meaning of the ADA.

### 2. Adverse employment action related to disability

Even assuming that Plaintiff could show that she was disabled, she would still need to prove "that [s]he suffered an adverse employment action because of h[er] disability." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cr. 2008) (citation omitted).  Defendants insist that Plaintiff cannot do this.  Defendants do not dispute that they terminated Plaintiff's employment, but they argue that no evidence supports a finding that the termination was because of Plaintiff's disability.  Plaintiff responds that she was subjected to a hostile work environment because of her disability, that she shared these claims of harassment with members of Defendants' employee relations team and Irene Cooney, her supervisor, and that Defendants failed to take any action about such harassment.  Since the alleged harassment continued, Plaintiff contends that she has produced evidence sufficient "for a reasonable jury to conclude that she was subjected to a

---

specifically informed Ms. Cooney about the fact that employees had gone through her personal items and that I had reported this disability-related harassment to employee relations previously, but nothing appeared to change . . . It was also in this discussion where Plaintiff disclosed to Ms. Cooney that she took disability-related supplements, which was what seemed to motivate the prior incident of harassment." *See* Plaintiff's Response at ¶ 161.  Plaintiff also complained to an Employee Relations employee that her coworkers had "accused" her of "taking narcotics" because they saw that she took supplements.  *Id.*  She told this employee, Karen Flynn, that the supplements were "disability-related."  *See id.*  Plaintiff cites only to her own affidavit to support her claim.  This evidence does not demonstrate that Defendants regarded Plaintiff as disabled.  At best, it demonstrates that Plaintiff claimed to be disabled.

hostile work environment claim based on disability-related harassment.[7]  Defendants argue that

rude behavior by coworkers is not an adverse employment action but do not respond directly to

this claim of harassment in their reply to Plaintiff's opposition to their motion.[8]

The Second Circuit has concluded that a plaintiff can raise a harassment claim under the

ADA.  *See Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019).  To prevail on such a

claim, a plaintiff "must show '(1) that the harassment was "sufficiently severe or pervasive to

alter the conditions of [her] employment and create an abusive working environment," and (2)

that a specific basis exists for imputing the objectionable conduct to the employer.'"  *Id.* (quoting

*Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d

143, 149 (2d Cir. 1997)).  "Although the victim must subjectively perceive the conduct as

abusive, the misconduct shown must be 'severe or pervasive enough to create an objectively

---

[7] Plaintiff does not cite any case law that addresses claims of disability-related harassment.

[8] Defendants argue that Plaintiff has failed to produce any evidence to support her claim that
Defendants failed to accommodate her alleged disability.  A plaintiff alleging a failure to
accommodate claim under the ADA "requires a showing that (1) plaintiff is a person with a
disability under the meaning of the ADA; (2) an employer covered by the statute had notice of
[her] disability; (3) with reasonable accommodation, plaintiff could perform the essential
functions of the job at issue; and (4) the employer refused to make such accommodations."
*Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004) (citation and
footnote omitted).

At her deposition, Plaintiff agreed that "the ability to eat and drink and snack at [her]
desk [was] accommodating [her] relating schedule for [her] health condition."  *See* ????? at 68.
Plaintiff further testified that her supervisor permitted her to eat small meals during the day
"because [Plaintiff] told her [that she] had to eat periodically."  *See id.* at 176.  The supervisor
never prohibited Plaintiff from eating or walking throughout the day and did not reprimand her
for being away from her desk to eat or walk.  *See id.*  Although Plaintiff complains that her
coworkers harassed her because she took supplements, no evidence indicates that Defendants or
Plaintiff's supervisors prohibited her from taking supplements at work.  As such, even if Plaintiff
had evidence that she requested accommodations, she does not have any evidence that
Defendants denied them.  She does not even attempt to make that argument.  Accordingly, for
these reasons, the Court grants Defendants' motion for summary judgment with reference to any
failure-to-accommodate claims.

hostile or abusive work environment.'" *Id.* (quotation omitted)  "Even an isolated act may be so serious that it requires the conclusion that the terms and conditions of employment were altered." *Id.* (citation omitted).  To prevail, "a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and that the conduct is connected to an employee's protected characteristic." *Pattanayak v. Mastercard Inc.*, No. 22-1411, 2023 U.S. App. LEXIS 5263, *9 (2d Cir. Mar. 6, 2023) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) (cleaned up) (citing *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019) (applying the same standard to the ADA)).  A court evaluating a hostile work environment claim, "'must consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Littlejohn [v. City of New York,]* 795 F.3d [297,] 321 [(2d Cir. 2015)]).

Plaintiff points to incidents which she claims represented harassment.  In her affidavit, Plaintiff claims that she took "disability-related supplements while at work" in January 2019. *See* Plaintiff's Affidavit at ¶ 18.  Plaintiff claims that she had explained her disability to coworkers in response to questions they asked her about why she did not eat company-provided lunches.  *See id.* at ¶ 16.  "Several employees" saw her taking supplements "and began engaging in harassing behavior, such as taunting [her] and accusing [her] of taking illegal narcotics at work (which [she] clearly was not doing)." *See id.* at ¶ 19.  Plaintiff contends that the statements were both "deeply insulting" and "clearly made in an effort to embarrass and humiliate [her] in a public manner." *See id.* at ¶ 20.  Plaintiff claims that "[t]hese employees also went through [her]

personal items, including [her] purse." *See id.* at ¶ 21. Plaintiff further alleges that a similar incident occurred in February 2019. *See id.* at ¶ 29. Again, "several employees . . . went through [her] personal items, including [her] purse, without [her] permission." *See id.* Plaintiff further contends that the workers "stole certain personal items and moved around items like [her] wallet." *See id.* Plaintiff claims that "[t]his harassment mimicked the prior harassment that had occurred after [she] had taken [her] disability-related supplements." *See id.* at ¶ 30. She alleges that this incident "escalated" the previous one, since "the employees involved actually stole items out of [her] personal belongings." *See id.*

Defendants argue that the Court should not credit any of these claims because they are contained in an affidavit filed in opposition to summary judgment that contradicts Plaintiff's sworn testimony at her deposition. "It is well settled in this circuit that a party's affidavit which contradicts [her] own prior deposition testimony should be disregarded on a motion for summary judgment." *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) (citations omitted). "A plaintiff cannot defeat a well-pleaded motion for summary judgment simply by submitting an affidavit that contradicts [her] earlier sworn statements." *Thomas v. Roach*, 165 F.3d 137, 144 (2d Cir. 1999). Nor may "a party . . . create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996) (citations omitted). "Thus, factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Id.* (citation omitted). Still, "'where . . . testimony is contradicted by evidence other than the deponent's subsequent affidavit, . . . the concern that the proffered issue of fact is a mere "sham" is alleviated.'"

*Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 482 (2d Cir. 2014) (quoting *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43-44 (2d Cir. 2000)).

Plaintiff testified to these incidents at her deposition.  She testified that, in January 2019, she "went in [her] purse to take [her] iron pill out and took it, and then went downstairs, and when [she] came back, the items in [her] purse were – the wallet was fumbled around and items were moved and they weren't organized as [she] had left them."  *See* Dkt. No. 32-10 at 179. When asked why she thought that employees "were going through [her] purse because [she] had to take a vitamin or supplement," Plaintiff explained, "[b]cause they asked [her] if [she] was taking drugs.  That was Jason Jackson asked [her], are you taking drugs?"  *See id.* at 182. Plaintiff admitted, however, that she did not know if she had reason to think Jackson went through her purse, that no one had ever told her that he went through her purse, and that she never saw Jackson going through her purse.  *See id.*  Plaintiff also testified that she believed she had reported a second incident of people going through her purse and that she thought she had "reported that a personal item was missing."  *See id.* at 183.

The Court cannot find a direct contradiction between Plaintiff's affidavit and her deposition in relation to these two claims about employees going through her purse and will consider that evidence in deciding whether Plaintiff has evidence to support her claim that she suffered harassment because of her disability.  Plaintiff's claim is that, on two occasions, her coworkers looked through her purse, invading her privacy, disrupting the purse's contents, and perhaps stealing items.  She further contends that this behavior occurred after coworkers noticed her taking supplements related to her disability and after she had explained to some people at work that she had a medical condition and took supplements as a result.

The Court finds, however, that the evidence that Plaintiff provides is insufficient for a jury to conclude that she faced harassment on the basis of her alleged disability.  First, the Court concludes that, although Plaintiff has presented testimony that she "subjectively perceive[d] the conduct as abusive," she has not presented evidence a reasonable juror could find was "'severe or pervasive enough to create an objectively hostile or abusive work environment.'"  *Fox*, 918 F.3d at 74 (quotation omitted).  Here, Plaintiff points to two instances, a month apart, where her coworkers allegedly looked through her purse, perhaps after an employee or employees teased her about taking supplements related to her health conditions.  Such conduct was not frequent, did not amount to any sort of direct threat, and did not interfere with Plaintiff's ability to do her job.  A reasonable juror could not conclude that the alleged harassment altered the terms of Plaintiff's employment.  Moreover, Plaintiff has not shown any connection to her alleged disability from her coworkers' conduct.  Plaintiff attempts to connect the incident to her coworkers' questions about the supplements she took and a suggestion that she was consuming illegal drugs but such allegations bear little relation to mishandling her personal property.  A reasonable juror could not find that such conduct, even if Plaintiff[9] rightly took offense to it, was connected to her disability.

---

[9] The parties agree that, if the Court dismisses Plaintiff's ADA claims, the Court should also dismiss her NYSHRL claims.  The Court agrees that this principle generally applies to ADA and NYSHRL, with the exception that "the NYSHRL" has "'a broader definition of "disability" than does the ADA,'" and that a plaintiff need not show "'that the disability substantially limits a major life activity'" under the NYSHRL."  *Ugactz v. UPS, Inc.*, No. 10-CV-1247 (MKB), 2013 U.S. Dist. LEXIS 43481, *52 (E.D.N.Y. Mar. 26, 2013) (quoting *Reilly [v. Revlon,]* 620 F. Supp. 2d [524,] 541 [(S.D.N.Y. 2009)]).  Here, however, the Court has concluded that Plaintiff, if she is disabled within the meaning of the NYSHRL, cannot make out a claim that she suffered an adverse employment action because of her disability with respect to her harassment and failure-to-accommodate claims and will grant Defendants' motion with regard to these claims under the NYSHRL as well.

C.      **Discrimination on the basis of sex**

Defendants argue that the evidence is insufficient to support a claim of hostile

environment sex discrimination under Title VII or the NYSHRL.  To make out a *prima facie* case

for Title VII discrimination, "a plaintiff must show that: (1) [s]he is a member of a protected

class; (2) [s]he performed the job satisfactorily; (3) an adverse employment action took place;

and (4) the action occurred under circumstances giving rise to an inference of discrimination."[10]

*Jackson v. New York City Transit*, 348 Fed. App'x 666, 668 (2d Cir. 2009) (summary order)

(citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed, 2d 668

(1973)).  Courts in the Second Circuit "have characterized the evidence necessary to satisfy this

initial burden as 'minimal' and '*de minimis*'" *Zimmerman v. Assocs. First Capital Corp.*, 251 F.3d

376, 381 (2d Cir. 2001) (citing *Byrnie v. Town of Cromwell*, 243 F.3d 93, 101 (2d Cir. 2001))

(other citation omitted).  The Supreme Court has "'established an allocation of the burden of

production and an order for the presentation of proof in Title VII . . . cases.'"  *Bucalo v. Shelter

Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (quoting *St. Mary's Honor Ctr. v.

Hicks*, 509 U.S. 502, 506, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).  "At the first stage," of this

burden-shifting framework, "the plaintiff bears the burden of establishing a 'prima facie' case."

*Id.* (quoting [*Texas Dep't of Cmty. Affairs v.] Burdine*, 450 U.S. [248,] 253, 101 S. Ct. 1089

---

[10] Plaintiff's memorandum of law in opposition focuses on sexual harassment as the basis of her claim that she suffered adverse employment action on the basis of her sex.  She also argues, however, that "[i]n addition to alleging sex discrimination related to her termination," she "has sufficiently established a legally distinct claim that she was subjected to a harassing and hostile work environment."  *See* Dkt. No. 35-1 at 13.  Plaintiff does not offer any evidence to support her argument outside the context of her claims of sexual harassment and a hostile work environment to support her claim that she was fired because she was a woman.  The Court will, therefore, make its determination about whether Plaintiff suffered discrimination within the meaning of Title VII based on the evidence related to hostile work environment and sexual harassment.

[(1981)]).  If the plaintiff meets these "'minimal'" requirements, the plaintiff has created "a presumption that the employer unlawfully discriminated against the employee.'"  *Id.* (quoting [*Burdine*, 450 U.S. at 254]).  The burden then shifts to the defendant, who must "'produc[e] evidence' that the adverse employment actions were taken "for a legitimate nondiscriminatory reason."'"  *Id.* at 128-29 (quoting *Hicks*, 509 U.S. at 506-07, 113 S. Ct. 2742 (quoting *Burdine*, 450 U.S. at 254, 101 S. Ct. 1089).  If the defendant offers such an explanation, the burden shifts back to the plaintiff, who must "'demonstrate that the proffered reason was not the true reason for the employment decision.'"  *Id.* (quoting *Burdine*, 450 U.S. at 256, 101 S. Ct. 1089) (other citation omitted).

Defendants argue in particular that Plaintiff cannot make out a hostile work environment claim under Title VII.  "'Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult.'"  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S. Ct. 2399, 2404-05, 91 L. Ed. 2d 49 (1986)).  A hostile work environment claim requires a plaintiff to show "'(1) that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [her] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.'"  *Id.* (quoting *Van Zant v. Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996) (quotation omitted)) (footnote omitted).

"[T]o hold an employer liable for . . . a hostile work environment, federal law requires the plaintiff to show 'a specific basis for imputing the conduct creating the hostile work environment to the employer.'"  *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 90 (2d Cir. 2019) (quoting *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (internal quotation marks omitted)).  A plaintiff

has two ways of showing such liability: "strict vicarious liability if an employer's supervisor has created the hostile environment, . . .; and negligence if a co-worker who is not a supervisor has created the hostile environment and the employer, upon becoming aware of the misconduct, fails to remedy it . . . [.]" *Id.* at 91 (internal citations omitted).  "[A]n employee is a supervisor only 'when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* (quoting [*Vance v. Ball State University*, 570 U.S. 421,] 431 [(2013)], 133 S. Ct. 2434 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)).  "The hallmark of the tangible employment action thus used to identify a supervisor is its potential 'to inflict direct economic injury.'" *Id.* (quoting [*Vance*, 570 U.S.] at 440, 133 S. Ct. 2434).  If the employee creating the hostile environment is not a supervisor, "the employer can still be liable, but 'only for its own negligence.'" *Id.* at 92 (quoting *Summa v. Hofstra Univ.*, 708 F.3d [115,] 124 [(2d Cir. 2013)] (internal quotation marks omitted)).  To show culpable negligence, "a plaintiff must adduce evidence 'that the employer failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.'" *Id.* (quoting [*Summa*, 708 F.3d at 124] (internal quotation marks omitted)) (other citation omitted).

Defendants argue that Plaintiff cannot demonstrate the existence of a hostile work environment and that, even if she could, she could not demonstrate that Defendants knew or should have known about any harassment and failed to take appropriate remedial actions. Plaintiff contends that the environment to which she was subjected constituted a hostile one.  She does not argue that either of her coworkers who allegedly harassed her were supervisors.

Instead, she argues that she put the company on notice of the harassment, and the company failed to act. Plaintiff does not argue that Defendants are responsible for any other type of sex discrimination. The parties thus appear to agree that, if evidence of a Title VII claim exists, it comes in the form of a hostile work environment of which Defendants knew or should have known and did nothing to rectify it.

The Court will first address whether the record contains evidence from which a reasonable jury could find the existence of a hostile environment and then examine whether a reasonable jury could find that Defendants are responsible for this environment.

### 1. Evidence of a hostile work environment

Plaintiff alleges that she "was subjected [to] *numerous* instances of sexual harassment by two separate managers at her dealership starting in the winter of 2019 and spanning over the course of *months* of her employment." *See* Dkt. No. 35-1, Plaintiff's Memorandum of Law, at 14. Plaintiff's worksite was at Carbone Yorkville Honda, which Defendant Lithia of Yorkville-3, LLC owned. *See* Defendants' Statement at ¶¶ 3-4. Lithia Support Services, Inc. hired Plaintiff on October 1, 2018. *See id.* at ¶ 5. During her employment, Plaintiff mostly worked in the Accounting Department at Yorkville Honda. *See id.* at ¶ 6. When first hired, Plaintiff's worksite was at the corporate office in Yorkville, New York. *See id.* at ¶ 34. Her supervisor was Elizabeth "Betsey" Rasmussen. *See id.* Plaintiff moved to Carbone Yorkville Honda in early December 2018. *See id.* at ¶ 35. Irene Cooney became Plaintiff's supervisor in January 2019. *See id.* at ¶ 36.

Pointing to her affidavit, Plaintiff alleges that, in the winter of 2019, Jason Jackson, who worked at Carbone Yorkville Honda, began to "come up behind" her, "appear to initially look at her computer monitor," and then "lean over her, pressing himself into her body, and physically touch[ing] her when he did so." *See* Plaintiff's Statement at ¶ 21.  Plaintiff "'could tell he was looking down the neck opening of [her] shirt at [her] breasts[.]" *See id.*  Mr. Jackson was not making eye contact, and he did not look at the computer screen. *See id.*  Plaintiff also claims that Mr. Jackson put his hands on her shoulders and "rubbed her shoulders in a sexually charged manner." *See id.*  Mr. Jackson's conduct made her "feel extremely uncomfortable, violated, humiliated, denigrated, and harassed." *See id.* at ¶ 22.  Plaintiff told Mr. Jackson she "was not interested in his advances and wanted them to stop," but the behavior continued. *See id.* Plaintiff also alleges that, "[o]n one occasion, she went into Jackson's office." *See id.* at ¶ 23. Mr. Jackson "leaned back in his desk chair and grabbed his erect penis with his hand from outside his pants, so [she] could see the size of his penis clearly through his pants." *See id.*  Mr. Jackson "leered at" Plaintiff while he did this. *See id.*  Mr. Jackson's actions caused Plaintiff to "feel extremely violated and uncomfortable." *See id.*  Plaintiff further alleges that, "[o]n another occasions," Mr. Jackson "slid his hand up" her "butt while she was walking up the stairs at the dealership wearing a skirt." *See id.* at ¶ 25.  Plaintiff further contends that she "believed" that coworkers Michelle Jackson, Diane Baum, and Lyndsay Lesniak "might have seen or heard [Mr. Jackson's] sexual harassment." *See id.* at ¶ 26.  Finally, Plaintiff alleges that, "[a]fter April 2019," Mr. Jackson "touched [her] left leg" while sitting next to her at her desk. *See id.* at ¶ 56. That conduct made Plaintiff "very uncomfortable," and she "made it clear to Mr. Jackson that he should stop." *See id.*

Defendants respond to these allegations by arguing that Plaintiff cites only to her own affidavit as evidence to support them and note that Plaintiff did not include any of these allegations in her written complaints of harassment and did not report them to the investigator on her harassment complaint. Plaintiff's deposition, however, does contain allegations that Jason Jackson rubbed her shoulders, leaned back in his chair and grabbed his penis, and grabbed her butt. *See* Plaintiff's Deposition at 202. Plaintiff also claimed that, "after [she] told" Mr. Jackson "not to do it, he rubbed against [her] leg. *See id.* at 203. Plaintiff also told Irene Cooney that Mr. Jackson "looked down [her] shirt. He looked down [her] shirt more than once." *See id.* Thus, to the extent that Plaintiff's claims about Mr. Jackson's conduct can be considered evidence of sexual harassment as part of a hostile environment, evidence exists in the record beyond Plaintiff's affidavit by which a reasonable jury could conclude that Mr. Jackson engaged in such conduct.

The conduct about which Plaintiff complains consists of incidents where Mr. Jackson touched Plaintiff on her rear end, rubbed her shoulders in a manner that Plaintiff perceived as sexual, touched himself inappropriately in Plaintiff's presence, looked down Plaintiff's shirt at her breasts, and touched Plaintiff's leg in an inappropriate manner. Plaintiff does not offer an exact number of times such conduct occurred, but she does claim that Mr. Jackson looked down her shirt more than once. A plaintiff claiming a hostile work environment "must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (citations omitted). "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Id.* at 374 (quoting *Perry [v. Ethan Allen, Inc.]*, 115 F.3d [143,] 149 [(2d Cir. 1997)]). "Isolated

acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Id.* (citations omitted). Still, "'even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment[.]'" *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 437 (2d Cir. 1999) (citation omitted). At the same time, a court is "cautioned to consider the totality of the circumstances . . . and to evaluate the 'quantity, frequency, and severity' of the incidents[.]" *Id.* (citing [*Schwapp,* 118 F.3d at 111] (citing *Vore v. Indiana Bell Tel. Co.*, 32 F.3d 1161, 1164 (7th Cir. 1994))). The Court must consider the evidence "'cumulatively,' so that [the court] may 'obtain a realistic view of the work environment.'" *Id.* (quoting [*Vore*, 32 F.3d at 1164] (quoting *Doe v. R.R. Connelley & Sons Co.*, 42 F.3d 439, 444 (7th Cir. 1994))). The plaintiff must also show that she "'subjectively perceive[d] that environment to be abusive.'" *Agosto v. N.Y. City Dep't of Educ.*, 982 F.3d 86, 102 (2d Cir. 2020) (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)).

In evaluating this evidence, the Court first concludes that a reasonable jury could find that Plaintiff, who alleges that Mr. Jackson's conduct offended her and that she told him to stop, subjectively perceived Mr. Jackson's condut to be abusive. In terms of whether a reasonable person would come to a similar conclusion, Plaintiff argues that Mr. Jackson's conduct, taken as a whole, is sufficient for a jury to conclude that an abusive environment existed. The Court agrees. The record here, viewed in the light most favorable to Plaintiff, contains evidence from which a reasonable jury could conclude that Mr. Jackson repeatedly engaged in conduct that was sexual in nature and which involved invasions of Plaintiff's personal space in a fashion that a reasonable person would find offensive. Mr. Jackson's conduct was not merely workplace teasing, but sexually charged conduct that included touching his own genitals and staring at Plaintiff's breasts. Moreover, Plaintiff claims that Mr. Jackson touched her butt and her leg in an

unwanted manner without permission, which could be considered an assault.  Under these circumstances, the Court finds that reasonable jury could find that sexual harassment occurred. *See, e.g., Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 179 (2d Cir. 2012) (finding that "[t]he repeated touching of intimate parts of an unconsenting employee's body is by its nature severely intrusive and cannot properly be characterized as abuse that is 'minor.'  This is not a manner in which [people] 'routinely interact'; . . . and it is not conduct that is normal for the workplace." (internal citation omitted)).

Plaintiff also alleges sexual harassment from Matt Hensel, the Used Car Manager at the Honda Dealership.  Plaintiff claims that Mr. Hensel "touch[ed] his genital area frequently while he walked by her desk."  *See* Dkt. No. 35-3 at ¶ 27 (citing Hubalek Aff. ¶¶ 47, 49).  She claims this conduct began "in March or April 2019."  *See id.*  "On or around May 22, 2019, . . .Mr. Hensel  . . . dropped a check onto the floor and grabbed his genital area" when Plaintiff "bent over to pick up the check."  *See id.* at ¶ 57 (citing Hubalek Aff. ¶ 55).  Plaintiff alleges that "Mr. Hensel pulled on his penis while [her] face was just inches away."  *See id.* at ¶ 109.  Plaintiff reported to an investigator that Mr. Hensel had been "simulating oral sex[.]"  *See id.*  Plaintiff felt "degraded and like I was giving him a 'blow job.'"  *See id.*  Although this type of incident happened only once, Plaintiff contends that she told the investigator that "there were numerous other instances where" Mr. Hensel "was constantly grabbing and pulling his penis and genitals" when he walked by her desk.  *See id.*

Defendants respond that Plaintiff testified at her deposition that the first time she saw Mr. Hensel touching his genitals was when he allegedly touched his penis after Plaintiff bent down to pick up a dropped check.  *See* Defendants' Response at ¶ 27.  At her deposition, Plaintiff testified about the incident.  *See* Plaintiff's Deposition at 208-18.  She testified that she "went and . . .

handed Matt [Hensel] a check that he had requested, and the check fell to the floor, so I bent over to pick up the check and Matt grabbed is penis and pulled it as I was coming up and made me feel like I was giving him a blow job." *See id.* at 208.  Plaintiff explained that she "bent over, picked up the check.  As [she] came up, his hands were on his penis[.]" *See id.* at 211.  She later explained that Mr. Hensel "grabbed his penis as I was coming up and my face was coming up." *See id* at 213.  Although Mr. Hensel did not touch Plaintiff's face, his genitals were "probably six inches" from her face.  *See id.* at 216.  Defendants' counsel asked Plaintiff if "[o]n any prior occasions had [she] seen Matt Hensel adjust his genitalia in his pants?" *See id.* at 213.  "Before he did this to me?" Plaintiff asked.  *See id.*  Counsel responded, "[o]n any prior occasion, yes?" Plaintiff explained, "[p]rior.  No." *See id.*  Plaintiff also testified, however, that "[w]henever he would come upstairs, he would make it obvious to rub his penis while walking by my desk.  All of the incidents happened up near by desk." *See id.* at 217.  Mr. Hensel would "[t]ake his hand, put it between his legs, and rub down on his penis." *See id.*  Plaintiff could not remember how often Mr. Hensel engaged in such conduct, or how many times he did so but believed that Mr. Hensel aimed the conduct at her.  *See id.*  She also testified that "the incidents where he would rub his genitals ear [her] desk" occurred "after" the incident with the check.  *See id.* at 224-25.

The parties appear not to dispute that a reasonable jury could hear the evidence in question and conclude that Mr. Hensel touched his genitals near Plaintiff's face when she bent over to pick up a check on May 22, 2019.  Evidence also exists from which a reasonable jury could find that Mr. Hensel touched his penis in Plaintiff's presence on other occasions after this incident.  To the extent that Plaintiff's affidavit indicates that Mr. Hensel began this practice of touching his penis in Plaintiff's presence before the May 22, 2019 incident, however, her deposition testimony clearly contradicts that claim.  As the affidavit is the only source for

Plaintiff's claim that Mr. Hensel's frequent and repeated conduct touching his penis in Plaintiff's presence occurred prior to the May 22, 2019 incident, the Court will not credit that claim.

The Court finds this evidence sufficient for a reasonable jury to conclude that sexual harassment occurred. Plaintiff has presented evidence that she subjectively perceived Mr. Hensel's conduct to be sexual in nature, aimed at her, and highly offensive. The evidence also indicates that a reasonable juror could conclude that on May 22, 2019, Mr. Hensel stood next to Plaintiff when she bent down to pick up a check. When Plaintiff stood up, she found Mr. Hensel holding his penis through his pants six inches from her face, simulating Plaintiff giving him a blow job. Although not necessarily an assault – no allegations of touching or attempted touching exist – a jury could nonetheless find that conduct sexually charged, offensive, and an invasion of Plaintiff's personal space in a highly degrading manner. A reasonable jury could also find that Mr. Hensel followed up that initial conduct by repeatedly walking by Plaintiff's desk, holding his penis in a manner that seemed to recall the incident with the check and in a way that bore sexual implications. Considering the totality of the circumstances, the Court finds that a reasonable jury could conclude that the "abuse [here was] so pervasive or severe as to alter [Plaintiff's] working conditions[.]" *Redd*, 678 F.3d at 176.

### 2. Imputing the conduct to the employer

Having found that a reasonable jury could find the existence of a hostile work environment, the Court must determine whether Plaintiff has produced evidence providing "'a specific basis for imputing the conduct creating the hostile work environment to the employer.'" *Bentley*, 935 F.3d at 90 (quoting *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013)

(internal quotation marks omitted)).  Since the parties agree that Mr. Hensel and Mr. Jackson did not supervise Plaintiff, she "must adduce evidence 'that the employer failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.'" *Id.* at 92 (quoting [*Summa*, 708 F.3d at 124] (internal quotation marks omitted)).  "An employer that has knowledge of a hostile work environment has a duty to take reasonable steps to remedy it." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 65 (2d Cir. 1998) (citing *Murray*, 57 F.3d at 249 (hostile work environment)) (other citation omitted).  In that situation, "[l]iability will not attach unless the company failed to take reasonable steps to eliminate the harassment." *Id.*  Courts judge whether a "response was reasonable . . . from the totality of circumstances." *Id.*  "Factors to be considered in this analysis are the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment." *Id.* (citation omitted).

Plaintiff contends that the record contains evidence that she notified her employer of the alleged harassment and that the harassment continued after she gave this notice.  As evidence that Plaintiff notified her employer of Mr. Jackson's harassment, Plaintiff points to two events.  She claims that she told Irene Cooney about Mr. Jackson's conduct "in the winter of 2019."  *See* Dkt. No. 35-1 at 15-16.  She also contends that she "emailed an Anti-Harassment/Discrimination training to managers at her facility and urged them to ensure that all employees and managers took the training."  *See id.* at 16 (citing SMF ¶ 45).  Plaintiff claims that "[t]he Employee Relations manager to whom Plaintiff's email was forwarded admitted that she interpreted it as a complaint about sexual harassment by Plaintiff."  *See id.* (citing SMF ¶¶ 48-49),  Plaintiff contends that the company did not take any remedial action in response to her complaints.  *See*

*id.* at 17.  She alleges that Irene Cooney "admitted that she never informed anyone at the Company of Plaintiff's complaints about sexual harassment and took no steps to stop the harassment." *See id.* (citing SMF ¶¶ 66-67).  She also contends that "[i]t is undisputed that Employee Relations never communicated with the alleged harassers, never told the managers of these harassers to stop the harassment, and took no other measures as a result of [her] complaints to stop or prevent the harassment." *See id.* (citing SMF ¶¶ 24, 45, 53, 56-59, 60-61, 64, 72-73, 180-182, 185-186).

Defendants respond that, even if Ms. Cooney reported the harassment, no additional harassment occurred from Mr. Jackson after Plaintiff's report to Ms. Cooney.  *See* Dkt. No. 38-3 at 10.  Defendants also argue that the interviewer did not speak to any witnesses because Plaintiff expressed a fear of bias in his interview with her and because she reported that the conduct did not continue.  *See id.* at 10-11.  Moreover, Plaintiff did not provide the names of specific witnesses with whom the investigator could speak.  *See id.* at 10.

In support of these claims, Plaintiff points to her statement of material facts.  There, she states that, "[i]n the winter of 2019, [she] raised concerns to Ms. Cooney about the ongoing sexually harassing behavior by Mr. Jackson and reported 'that he was touching my shoulders in an unwanted manner and that he looked down my shirt more than once.'"  *See* Dkt. No. 35-3, Plaintiff's Statement, at ¶ 24 (citing Hubalek Aff. ¶ 42).  Plaintiff also alleges that she reported to Ms. Cooney the incident where Mr. Jackson allegedly grabbed his penis in Plaintiff's presence while he was sitting on a chair in his office.  *See id.* (citing Hubalek Aff. ¶ 42).  Plaintiff's affidavit does not contain any citations to the record in support of these claims.  *See* Plaintiff's Affidavit at ¶ 42.  Defendants respond by admitting that Plaintiff "testified that she made some reports to Irene Cooney."  *See* Dkt. No. 38-2, Defendants' Response, at ¶ 24.  Defendants also

contend that the admissible evidence demonstrates that Plaintiff did not include any of those allegations in the written complaints of harassment she filed with the company and that she did not contact the employee relations department with these concerns. *See id.*

Plaintiff further "forwarded an announcement of an 'Anti-Harassment/Discrimination' training to Yorkville Honda General Sales Manager Craig Bunch" on April 27, 2019. *See* Dkt. No. 35-3 at ¶ 45. Plaintiff included a message that "I do believe your managers and team members should be taking this training. It's a requirement that they actually take and understand the training and not just pass through it.'" *See id.* Mr. Bunch forwarded this email to Human Resources Official Crystal Guzzardo. *See id.* at ¶ 47. Ms. Guzzardo forwarded the e-mail to "a higher level HR official," including Ms. Cooney in the message. *See id.* Ms. Guzzardo stated, "'Can you team assist the Honda crew with an employee matter? This employee has a tendency to overstep and the management team would like this latest example (below) documented.'" *See id.* (citing Cooney 9.19.22 Ex. 8 (Cooney 9.19.22, p. 139) (Gabriel Aff. Exs. 2 & 9)). Ms. Cooney testified that she received the email and that she understood that Plaintiff "belied it was 'important' for the employees in the Yorkville Honda location to take anti-harassment training." *See id.* at ¶ 48 (citing Cooney 9.19.22, p. 142) (Gabriel Aff. Ex. 2)). Ms. Guzzardo testified that, when she saw the email, she thought Plaintiff "'had some sort of concern related to harassment or discrimination, which was causing her to want to make sure the managers and employees took this training.'" *See id.* at ¶ 49 (citing (Guzzardo, p. 102) (Gabriel Aff. Ex. 4)).

At her deposition, Plaintiff testified about various incidents with Mr. Jackson and said that she had reported them to the company investigator. *See* Plaintiff's Deposition at 199-200. Defendants' counsel then asked if Plaintiff had "report[ed] this to anybody else?" *See id.* at 200. Plaintiff replied, "I reported the fact that he was touching my shoulders to Irene." *See id.* at 201.

Counsel then asked Plaintiff if she had "also mentioned him leaning back in his chair and grabbing his penis?"  *See id.* at 202.  "Correct," Plaintiff responded.  *See id.*  Counsel then asked, "[a]nd you mentioned him grabbing your butt?"  *See id.*  "Correct," Plaintiff again replied.  *See id.*  She also testified that she told Ms. Cooney that, "[a]fter I told [Mr. Jackson] not to do it, he rubbed against my leg."  *See id.*  Plaintiff continued to testify on the matter.  *See id.* at 202-05.  The testimony is not entirely clear about when Plaintiff reported these incidents to Ms. Cooney, and in what context, but Plaintiff again affirmed that she told Ms. Cooney that Mr. Jackson "came up behind [her] and was massaging [her] shoulders," "looked down [her] shirt more than once," and described the incident in Mr. Jackson's office where he leaned back in the chair and "grabbed his penis."  *See id.* at 203-04.  She also testified that she told Ms. Cooney that Mr. Jackson "came back to [her] and sat by [her] side at the side of [her] desk and rubbed [her] leg."  *See id.* at 204.

        The Court finds that this evidence is sufficient for a reasonable jury to conclude that Plaintiff notified her supervisor of the harassment she claims she faced from Mr. Jackson.  Although Defendants may certainly point to any contradictory evidence they have from Ms. Cooney and cite the absence of any complaints about Mr. Jackson in the written reports that Plaintiff made and in the records of conversations with the investigator, evidence exists from which a reasonable jury could conclude that Plaintiff reported Mr. Jackson's alleged harassment to a supervisor.  The evidence related to Plaintiff's email, however, could not be used by a reasonable jury to conclude that Plaintiff had put her supervisor on notice of any harassment.  The email does not mention a particular incident or employee.  At best, the evidence demonstrates that Plaintiff had a general concern about the issue and not about a specific event or situation.  Still, enough evidence exists to conclude that Defendants had notice about the issue.

The question then becomes whether, once Defendants became aware of Mr. Jackson's conduct, they took "reasonable steps to remedy it." *Distasio*, 157 F.3d at 65.  Courts judge whether a "response was reasonable . . . from the totality of circumstances." *Id.*  "Factors to be considered in this analysis are the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment." *Id.*  Defendants do not dispute that Ms. Cooney failed to notify anyone else of Plaintiff's claims regarding Mr. Jackson and that no investigation regarding them occurred.  Instead, they argue that no investigation was necessary because Mr. Jackson did not repeat the behavior.  The Court notes that a question of fact exists on that issue.  Moreover, a reasonable jury could conclude that Defendants did nothing in response to Plaintiff's complaints about Mr. Jackson's conduct.  An employer who fails to act to investigate and respond to allegations that an employee repeatedly engaged in unwanted contact with a coworker that was sexual in nature certainly did not take any reasonable steps to remedy the situation.

Plaintiff also contends that she put her supervisor on notice about the conduct "by sending a detailed account of the sexual harassment she was being subjected to by [Mr.] Hensel" on June 17, 2019.  *See* Dkt. No. 35-1 at 16 (citing SMF ¶ 73).  She then spoke with John Acosta, an investigator about her claims.  She alleges that she "provided a detailed account of the genital touching and ongoing sexual harassment she had been subjected to by both [Mr.] Hansel and Mr. Jackson." *See id.* at 17 (citing SMF ¶¶ 85, 109-117).

Plaintiff sent an email to Geoff Gill on June 17, 2019, titled "Harassed at the Work Place." *See* Dkt. No. 32-14.  This email reads as follows:

> On 5/21/19 Maria Cruz was very aggressive toward me, pointing her finger in my face and extremely loud so everyone could also

hear her at 9:15am, stating the [sic] I was sharing her personal business and stating that she was doing [sic] thing with a manager that I had no clue was going on or assuming it had gone on.  Two co-workers (ANDREA MALACHOWSKI AND LYNDSAY LESNIAK) witness[ed] the whole situation as I took this abusive action toward me.  She is one of your sale's [sic] rep at the Honda store and I am positive that this action is NOT professional.  It is not the first time she has had a confutation [sic] in this store and also on the sales floor.  Now the manager she assumed I said she was doing things with, was also sexual harassing me periodically as I would go into there [sic] office, he would pull and rub on there [sic] own genitals as I was trying to conduct business transactions.  He also did this again on 5/22/19 as I was handing him a check for the purchase of a vehicle, he dropped it and as I picked it up, he again did the genital action toward me.  This is very uncomfortable.  This is the professional manager you have assigned to conduct business for your Honda store.

I was also told that the purchase of the vehicle that I bought from this store, that they were to make as much of a profit off of me, regardless I was an employee.

I am not stating I am perfect at my job.  I am [sic] do make mistakes, but I also try to learn from them.  I have my own desk and it should be may personal space.  I shouldn't have to worry about anyone going through it or any other things.  Agreed?

I work with the Service manager and the Parts Manager with there [sic] employees and there doesn't seem to be an issue with us communicating at all.  Never is their [sic] a confutation [sic] when work needs to be corrected at both ends.

It's now 6/12/19 and I have been here a bit over 6 months and not once have I had a review.  [T]he policy's [sic] in your hand books [sic] say[] it should be a 30 day review.

So I am asking advice on the action that should be taken in this matter?

*See id.*

Mr. Gill forwarded the email to Gina Morse that same day, and she sent a copy of Plaintiff's email to John Acosta the same day, asking him to "investigate the concerns below." *See* Dkt. No. 32-15.  Mr. Acosta then sent an email to Plaintiff, informing her of his name and the

- 37 -

fact that he worked in the Employee Relations Department.  *See* Dkt. No. 32-16.  He thanked her for her email and stated that "[w]e take all concerns of this nature seriously and we will be moving forward to address them appropriately."  *See id.*  Mr. Acosta stated that he would conduct "a fact finding process into the concerns brought forward[.]"  *See id.*  He promised to keep the information confidential "as is practical" and stated that "retaliation for being involved in a complaint will not be tolerated."  *Id.*  he promised to contact her "shortly" and included information on filing a sexual harassment complaint under the company's sexual harassment prevention policy, as well as the policy itself.  *See id.*

Plaintiff and Mr. Acosta then exchanged emails and set up a telephone call.  *See* Dkt. No. 32-17.  Mr. Acosta made notes of the subsequent phone conversation.  *See* Dkt. No. 32-19. According to those notes, the two began their discussion of the concerns raised in Plaintiff's notes by discussing her complaints about coworkers going through her purse.  *See id.* at 3-4.  She continued to explain that "the Used Car Manager every time I would try to conduct business with him, he would put his hands near his genitals."  *See id.* at 5.  Plaintiff "underst[ood] a male adjusts his pants and things like that," but she wondered "how many customer[s] have you done that in front of."  *See id.*  Mr. Acosta asked if Plaintiff felt that the adjustment was "intentional towards you?"  *See id.*  Plaintiff answered, "[o]nly one time."  *See id.*  Plaintiff identified that manager as Matt Hensel.  *See id.* at 6.  Plaintiff described the incident: "I was handing him a check and he didn't grab it and it fell to the floor."  *See id.*  Mr. Hensel, she explained, "was always . . . grabbing himself in the genital area."  *See id.*  He did so when Plaintiff bent over to pick up the check, which "felt really intentional."  *See id.*  According to Mr. Acosta's notes, Plaintiff denied that "anything like you feeling he has touched himself inappropriately [had] happened since 5-22."  *See id.*  The notes state that Plaintiff said, "It is not something that he

does anymore." *See id.* Plaintiff stated that "[h]e has been 100% respectful" since that incident. *See id.* Plaintiff speculated that perhaps Mr. Hensel had taken training on sexual harassment and reported that "now he is great to work with. He respects me and I respect him." *See id.* Mr. Hensel, she told Mr. Acosta, had not repeated the conduct and acted "very professional[ly] and especially with the customers." *See id.* at 7. Mr. Acosta's notes also state that Plaintiff reported Mr. Hensel's misconduct to Ms. Cooney "when she came in for month end . . . at the end of May." *See id.* Plaintiff reported, "I gave her the sense that it was done sexually. I told her what he was doing was sexual harassment and I don't think that he knows that." *See id.* Plaintiff speculated that "she might have said something. Things started to change around that time[.]" *See id.* Plaintiff also told Mr. Acosta that "he is not the only one doing that. There are other ones. It is just the nature of the male to do that but when he did it that time it felt purposely done." *See id.* at 8. When asked if others around her had behaved in similar "sexually inappropriate way[s]," Plaintiff responded "no. Matt has completely changed and so are [sic] the others." *See id.* The two also discussed Plaintiff's complaints about her coworker Maria's conduct and Plaintiff's failure to receive a review after six months on the job. *See id.* at 8-12.

Plaintiff offered a different version of this conversation at her deposition. *See* Plaintiff's Deposition at 200, 235-56. Plaintiff testified that she told Mr. Acosta about Mr. Jackson's inappropriate behavior, including his touching of her shoulders, that when she was in his office Mr. Jackson sometimes "tilt his chair and rub his dick so I could see the size of it," and "I told him that he touched my ass, my butt," though she could not remember her exact words. *See id.* at 200. Plaintiff testified that she could not remember many of the statements in Mr. Acosta's notes, but she could remember that she "reported about . . . Matt Hensel, Jason Jackson, how [she] spoke to Irene Cooney, and how Allen Mukic also was aware of the situation." *See id.* at

239.  She remembered telling Mr. Acosta about Mr. Hensel's putting his hand near his genitals and telling Mr. Acosta that she understood that a man might have to "[adjust] his pants and things like that," but that doing so in front of a customer would be inappropriate.  *See id.* at 241.  Plaintiff testified that she remembered making such a statement and that "I believe, yeah, [I] brought up the sexual harassment."  *See id.*  Plaintiff could not remember telling Mr. Acosta that Mr. Hensel had only engaged in inappropriate conduct one time or that the conduct felt "intentional" only once.  *See id.* at 245, 246.  Plaintiff also could not recall telling Mr. Acosta that she did not want to name Mr. Hensel or that he was "great to work with."  *See id.* at 246.  She did not recall describing the incident with the dropped check in the way Mr. Acosta recorded it.  *See id.* at 248.  Plaintiff also did not remember telling Mr. Acosta that Mr. Hensel had not repeated the behavior after that incident.  *See id.* at 251.  She did not recall telling Mr. Acosta that Mr. Hensel was "respectful" towards her.  *See id.* at 252.  Plaintiff also claimed that she "mentioned someone else to [Mr.] Acosta," but did not give a specific name.  *See id.* at 253.  Plaintiff also denied stating that the inappropriate behavior stopped after the training.  *See id.* at 254.

With respect to Plaintiff's claims about Mr. Hensel's harassment, a reasonable jury could certainly find that Plaintiff put Defendants on notice of that conduct.  Defendants certainly acted as if they were on notice since they began an investigation.  The question is, thus, whether, considering the totality of the circumstances, Defendants' response was reasonable.  Plaintiff's position is that Defendants did not conduct a proper investigation by failing to interview any witnesses or the alleged perpetrator of the harassment and by failing to issue any training or sanctions to Mr. Hensel for his conduct.  Defendants' position is that no investigation or action against Mr. Hensel was necessary or reasonable because Plaintiff told Mr. Acosta that the conduct had not been repeated and that Mr. Hensel had been a "gentleman" since the initial

incident and perhaps after some training from the company.  Moreover, Plaintiff's request that the situation remain confidential meant that Mr. Acosta could not ask others about the incident or seek out potential witnesses without undermining his promise that the situation remain confidential.  The evidence detailed above, however, indicates that a question of fact exists as to whether Plaintiff actually told Mr. Acosta that Mr. Hensel's misconduct had stopped, that he was a gentleman, that she saw no reason to discipline him, and that she did not want to name him.  The Court must, therefore, conclude that a question of fact exists about whether Defendants' response to Plaintiff's complaint of sexual harassment about Mr. Hensel was reasonable in light of the totality of the circumstances.  "An employer cannot be subject to a hostile work environment claim . . . if the 'employer has in good faith taken those measures which are both feasible and reasonable under the circumstances to combat [the] offensive conduct.'"  *Russell v. N.Y. Univ.*, 739 Fed. App'x 28, 30 (2d Cir. 2018) (summary order) (quoting *Snell v. Suffolk Cty.*, 782 F.2d 1094, 1104 (2d Cir. 1986) (quoting *DeGrace v. Rumsfeld*, 614 F.2d 796, 805 (1st Cir. 1980))).  Given these questions of fact, a reasonable jury who believed Plaintiff's version of events could conclude that Mr. Acosta refused to investigate the situation and instead falsely reported that an incident had been resolved to Plaintiff's satisfaction.  A reasonable jury could also find that Defendants did not in good faith take measures that were feasible and reasonable under the circumstances to combat the offensive behavior about which Plaintiff complained.  The Court therefore denies Defendants' motion for summary judgment with regard to Plaintiff's Title VII hostile work environment claim.[11]  Likewise, because "[h]ostile work environment claims under both Title VII and the NYSHRL are governed by the same standard," the Court also denies

---

[11] The Court finds that Plaintiff has not produced evidence of a Title VII violation under any theory other than her claim that she was subjected to a hostile work environment.

Defendants' motion with regard to any NYSHRL hostile work environment claims that Plaintiff has raised.  *See Summa*, 708 F.3d at 123-24.

**D.     Plaintiff's retaliation claims under the ADA, Title VII and the NYSHRL**

A plaintiff can raise a retaliation claim under the ADA by showing that "'(i) [she] was engaged in protected activity; (ii) the alleged retaliator knew that [she] was involved in protected activity; (iii) an adverse decision or course of action was taken against [her]; and (iv) a causal connection exists between the protected activity and the adverse action.'"  *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (quoting *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 148 (2d Cir. 2002) (internal quotations omitted)).  "'Protected activity' is 'action taken to protest or oppose statutorily prohibited discrimination.'"  *Id.* at 354 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000), *superseded on other ground by* N.Y.C. Local L. No. 85).  Although a plaintiff need not "'invoke the word discrimination when complaining in order to alert her employer to her protected activity, there must be some basis to conclude that the employer was aware that the plaintiff engaged in protected activity.'"  *Id.* (quoting *Lucio v. New York City Dep't of Educ.*, 575 F. App'x 3, 6 (2d Cir. 2014)).  A plaintiff can demonstrate the required causal connection "'either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."'"  *Id.* at 353 (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015) (quoting *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).  "'A plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment

action.'" *Tafolla v. Heilig*, 80 F.4th 111, 126 (2d Cir. 2023) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (alteration adopted) (internal quotation marks omitted)).

Under the ADA, "[o]nce a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate non-retaliatory reason for the challenged employment decision." *Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002).  If the defendant can meet this burden, "'the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely pretext for impermissible retaliation.'" *Id.* (quoting *Cifra[ v. Gen. Elect. Co.]*, 252 F.3d [205,] 216 [(2d Cir. 2001)]).

"Title VII provides that '[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 89-90 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e-3(a)).  Courts evaluate "retaliation claims using the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)." *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015).  "[T]he plaintiff bears the initial burden to establish a prima facie case of retaliation by offering evidence that she 'participated in a protected activity,' 'suffered an adverse employment action,' and 'that there was a causal connection between her engaging in the protected activity and the adverse employment action.'" *Id.* (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010)).  As with the ADA, a plaintiff establishing a *prima facie* case "creates a 'presumption of retaliation,'

- 43 -

which the defendant may rebut by 'articulat[ing] a legitimate, non-retaliatory reason for the adverse employment action.'" *Id.* (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).  If the defendant meets that burden, "'the presumption of retaliation dissipates,' and the plaintiff must prove 'that the desire to retaliate was the but-for cause of the challenged employment action.'"  *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, [570] U.S. [338, 352], 133 S. Ct. 2517, 2528, 186 L. Ed. 2d 503 (2013)).

In their memorandum of law, Defendants do not appear to dispute that Plaintiff has produced sufficient evidence that she engaged in protected activity under the statutes in question. Defendants instead argue that Plaintiff has not produced sufficient evidence to overcome the legitimate non-discriminatory reasons for their adverse employment actions and that Plaintiff lacks evidence to show that those reasons were pretext for the real reasons for Plaintiff's termination.  *See* Dkt. No. 32-45 at 35.

The Court agrees that Plaintiff has made out a *prima facie* case that her termination occurred after she engaged in protected activity and that there was a causal connection between the protected activity and Plaintiff's termination.  Plaintiff's termination occurred on August 27, 2019, slightly more than two months after her emailed harassment complaint and within months of her verbal complaints to Ms. Cooney about the conduct she considered discriminatory.  *See* Complaint at ¶ 139.  Such a close temporal proximity between Plaintiff's protected activity and the adverse employment action "is sufficient to support an allegation of a causal connection strong enough to survive a summary judgment motion."  *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cty.*, 252 F.3d 545, 555 (2d Cir. 2001).  The evidence of temporal proximity is bolstered by evidence of record from which a reasonable jury could conclude that Plaintiff complained of discrimination multiple times in the months leading to her termination.

*See id.* (stating that the court was "particularly confident that five months is not too long to support such an allegation where plaintiffs have provided evidence of exercises of free speech and subsequent retaliatory actions occurring between December 1997 and April 1998").

The next questions the Court must answer, therefore, are whether Defendants have offered legitimate non-discriminatory reasons for firing Plaintiff and, if they have, whether Plaintiff has produced evidence from which a reasonable jury could conclude that those stated reasons were pretextual.  The parties agree that Plaintiff's job of Dealership Accountant had a number of responsibilities, including "'ensuring timely, accurate and consistent recording of dealership transactions[.]"  *See* Defendants' Statement at ¶ 7.  Plaintiff had to "post new and used car deals, submit[] service contracts [and] warranty contracts, request[ and] process[] lien payoffs, [and] schedule reviews and maintenance, along with a number of other duties listed in the job description and potentially some not listed."  *See id.* (citing Ex. DD; Ex. H, p. 120, ln. 20 – p. 121, ln. 6' Ex. C, p. 50, ln. 9-17).  Plaintiff was an "at-will" employee.  *See id.* at ¶ 17.  Disciplinary action for Plaintiff's employer could include "verbal counseling, a written warning (an "ECN"), suspension and/or termination, but there are no required steps or number of warnings required prior to termination."  *See id.* at ¶ 18 (citations omitted).  The parties disagree about whether the dealership ever followed a system of progressive discipline that required managers to follow a series of steps before terminating a worker's employment.  *Compare* Defendants' Statement at ¶ 18 and Plaintiff's Response at ¶ 18.[12]  Plaintiff appears to

_____

[12] The Court has read all of the depositions of Defendants' employees and the management guidance and employee handbook in the record.  Plaintiff's counsel used a great deal of time in depositions asking about the existence of "progressive discipline," but nowhere in the record did the Court see any representative of Defendants admit that the company had a policy of following a series of particular steps before firing anyone, although evidence in the case indicates that managers sometimes issued warnings and notices to employees before firing them.  Plaintiff cites to an Employee Handbook, which provides as follows: "'Examples of disciplinary action include,

acknowledge that the system was not mandatory for managers but insists that managers sometimes used that practice when disciplining employees. *See* Plaintiff's Response at ¶ 18. Ms. Cooney received an assignment temporarily to oversee Carbone Yorkville Honda in January 2019 after Defendants bought the dealership. *See* Defendants' Statement at ¶ 28. At least part of her role was to train employees in Lithia policies and procedures. *See id.* Defendants contend that Ms. Cooney's role "was also to determine if the employees were qualified in their respective positions." *See id.* at ¶ 29.

"Between January 2019 and June 2019, Ms. Cooney worked to train Plaintiff, and the other employees at the Carbone Yorkville Honda store, in their job duties and responsibilities. *See id.* at ¶ 37 (citations omitted).[13] Ms. Cooney also started "assess[ing] the work each employee was accomplishing, and whether each employee was qualified for their position." *See id.* at ¶ 38 (citations omitted). During this period, Ms. Cooney's training of Plaintiff "included coaching her on what she was doing incorrectly in her job duties." *See id.* at ¶ 41 (citations omitted). Plaintiff points out that, during this period, she did not receive "any formal counseling, verbal warnings, discipline, or anything that could be construed as a verbal discipline or any form of corrective action." *See* Plaintiff's Response at ¶ 41 (citation omitted). Plaintiff admitted that Ms. Cooney had different expectations than her previous supervisors. *See id.* at ¶ 42. Plaintiff contends that Ms. Cooney did not provide meaningful training and did not sit down and

---

but are not limited to, verbal warnings, written warnings, suspension and/or termination of employment.'" *See* Plaintiff's Response at ¶ 19. The Court notes that this statement relates nothing about steps or a progression of discipline but simply describes a number of ways that managers could discipline employees. No promise of "progressive discipline" exists in that document.

[13] Plaintiff denies that she received "meaningful" training from Ms. Cooney.

conduct a formal training session with her.[14]  *See id.*  Ms. Cooney provided Plaintiff with training

in various areas, including issuing duplicate checks, matching up schedules, cleaning schedules,

and documentation of deals.  *See* Defendants' Statement at ¶ 43 (citations omitted).[15]

Defendants contend that, between January 2019 and June 2019, "[Ms.] Cooney had

spoken to Plaintiff multiple times about issues with her performance.  *See id.* at ¶ 44 (citations

_____

[14] Plaintiff testified as follows:

> A. Irene [Cooney] was very appraising . . . She was appraising me
> on how well I was doing, and like she would say, okay – you
> know, she might have asked, like, why do you do it this way?  And
> I would say, well, this is the way they taught me.
>     She goes, how about I help you do it an easier way or a
> quicker way.  She goes, I'm not saying that is the wrong way, she
> goes, but this might be faster for you.
> Q. Okay.  So she coached you in –
> A. At times, when – only when she was in the office.
> Q. Okay.  Did she ever give you corrections?  So, if she found
> something that she thought to be a mistake, would she call you and
> give you corrections or, if she was in person, meet with you and
> give you corrections?
> A. She would sit there and say, okay, so, you did a great job on this
> but you might have used the wrong account, which is – is not
> doing your job the wrong way, because it can always be corrected,
> she goes, but let me try to help you with the Bible.  The book of
> accounting was called the Bible . . .
>     And she goes, this is your Bible.  This is your life, she
> goes.  Every time you do a deal, you need to look in your Bible
> and, yes, there are multiple codes and journals that you can put that
> in, because I believe there were over 147 different numbers in that
> Bible of transactions of debits and credits or more . . . So she had
> never reprimanded me as to, no, you did this wrong.

*See* Plaintiff's Deposition at 104:9 -105:17.

[15] Plaintiff denies this statement, in part by claiming she did not receive "meaningful training."
*See* Plaintiff's Response at ¶ 41.  She further contends that Ms. Cooney failed to "conduct a
formal training session with" her, even though Ms. Cooney had promised to do so.  *See id.*
Plaintiff also states that "[Ms.] Cooney did not correct Plaintiff's ways of doing certain tasks (in a
formal disciplinary manner.)"  *See id.*  This denial, however, does not dispute that Ms. Cooney
provided training but rather claims the training was not effective.

omitted).  Plaintiff responds that "[Ms.] Cooney did not correct Plaintiff's way of doing certain tasks (in a formal disciplinary manner)."  *See* Plaintiff's Response at ¶ 44 (citation omitted). Moreover, Plaintiff contends "other than the July 2019 employee concern notice, Ms. Cooney had not provided Plaintiff with any formal counseling, verbal warnings, discipline, or anything that could be construed as a verbal discipline or any form of corrective action."  *See id.* (citation omitted).  Instead, Plaintiff claims, "[Ms.] Cooney frequently told Plaintiff that she was doing well and praised her performance."  *See id.* (citation omitted).

The Court finds that this denial does not dispute that some conversation between Ms. Cooney and Plaintiff about performance issues occurred.  Instead, Plaintiff emphasizes that the warnings were not written on paper and presented in any formal way until July 2019. Defendants further contend that Ms. Cooney "had issues with Plaintiff's performance, sense of urgency, attention to detail," and noted that "Plaintiff was continuing to make mistakes, which were all ongoing concerns despite months of training."  *See* Defendants' Statement at ¶ 45 (citations omitted).  Plaintiff disputes this claim by repeating that her training was not meaningful and that she never received formal warnings or formal training.  *See* Plaintiff's Response at ¶ 45 (citations omitted).  Plaintiff also insists that her work was satisfactory and complied with Defendants' rules and procedures.  *See id.*

Defendants hired David Guilbeault in June 2019 as an Area Controller.  *See* Defendants' Statement at ¶ 46.  Defendants contend that Ms. Cooney informed Mr. Guilbeault of her concerns regarding the accounting department at Carbone Yorkville Honda, including Plaintiff.  *See id.* at ¶ 48 (citations omitted).  Plaintiff contends that the concerns that Ms. Cooney offered were "manufactured" and related to Plaintiff's protected activities.  *See* Plaintiff's Response at ¶ 48 (citations omitted).  Ms. Cooney told Mr. Guilbeault that she had issues with Plaintiff "not being

present at her desk, not performing her assigned tasks in a timely matter [sic], causing others to handle them, being inaccurate, and not meeting the needs of her role." *See* Defendants' Statement at ¶ 49 (citations omitted). Plaintiff admits that Ms. Cooney raised these issues but alleges that the allegations were untrue and related to Plaintiff's protected activity. *See* Plaintiff's Response at ¶ 49 (citation omitted). During her first conversation with Mr. Guilbeault, Ms. Cooney "discussed the topic of disciplining Plaintiff and contemplated the need for her eventual termination because she had not been doing her job well" since before Mr. Guilbeault assumed his role. *See* Defendants' Statement at ¶ 50 (citations omitted). The parties disagree about whether Mr. Guilbeault witnessed the performance issues that Ms. Cooney described or if he deferred to Ms. Cooney's conclusions in deciding to end Plaintiff's employment. *Compare* Defendants' Statement at ¶ 51 and Plaintiff's Response at ¶ 51. Mr. Guildbault testified that he did some independent investigation into the accounting department and Plaintiff's performance and saw problems related to Plaintiff. *See* Defendants' Statement at ¶ 52. Plaintiff insists, however, that Mr. Guilbeault relied on Ms. Cooney's statements in assessing Plaintiff's performance. *See* Plaintiff's Response at ¶ 52. Mr. Guilbeault testified that he agreed with Ms. Cooney's assessment that Plaintiff should receive a formal written notice of discipline in July 2019 and agreed that Plaintiff should be fired in August 2019. *See* Defendants' Statement at ¶ 53 (citations omitted).

Ms. Cooney testified that she had been preparing to issue Plaintiff a written disciplinary notice ("ECN") in June, 2019, when she received word of Plaintiff's June 19, 2019 complaint. *See id.* at ¶ 54 (citations omitted). Ms. Cooney held off on issuing the ECN "to avoid even the appearance of retaliation." *See id.* Plaintiff does not deny that Ms. Cooney testified that she held off on delivering the notice for these reasons but, instead, points out that she had not received

any previous warnings or discipline from Ms. Cooney and alleges that Ms. Cooney had frequently told her she was doing good work.  *See* Plaintiff's Response at ¶ 54 (citations omitted).

Ms. Cooney gave Plaintiff a special assignment project between June 18, 2019, and July 18, 2019, that contained "explicit instructions on what needed to be completed."  *See* Defendants' Statement at ¶ 55 (citation omitted).  Plaintiff did not complete the task within the time instructed, and Defendants allege that Plaintiff offered no valid reason for this failing.  *See id.* at ¶ 56 (citation omitted).  Plaintiff admits she received the assignment but contends that she and another employee, Lyndsay Lesniak, were both assigned to the task.  *See* Plaintiff's Response at ¶ 55.  She also contends that Ms. Cooney's instructions were unclear, that the task added to their primary responsibilities, and that Ms. Cooney's expectations were unrealistic given their other responsibilities.  *See id.*  Both Plaintiff and Ms. Lesniak failed to complete the project in the time expected and Ms. Lesniak refused to complete the task as instructed.  *See id.*  Plaintiff notes that, although she received discipline for that failing, Ms. Lesniak did not.  *See id.* (citation omitted).

On July 18, 2019, based on these "continued concerns with Plaintiff's performance," Ms. Cooney asked the Employee Relations ("ER") Department to help her to prepare an ECN for Plaintiff.  *See* Defendants' Statement at ¶ 57 (citation omitted).  Ben Lorshbough in the ER Department drafted the notice based on information Ms. Cooney provided, but he had no personal knowledge of the issues Ms. Cooney raised.  *See id.* at ¶ 58 (citation omitted).  The ECN issued on July 24, 2019, detailed issues with Plaintiff's performance, "including her failure to clear schedules in the morning and timely complete her tasks."  *See id.* at ¶ 59 (citations omitted).  Plaintiff admits that the ECN issued but disputes the validity of the document and statements therein or that she had performed deficiently.  *See* Plaintiff's Response at ¶ 59 (citations omitted).  Mr. Guilbeault was present when Plaintiff received the ECN and agreed with

it being issued. *See id.* at ¶ 62. He testified that he agreed based both on Ms. Cooney's reports and on his own observations of Plaintiff's performance. *See id.* at ¶ 62 (citations omitted).[16]

Defendants claim that, after the July ECN, Plaintiff received instructions "at least three times" about clearing her schedules in the mornings before she posted deals, but she failed to do so. *See* Defendants' Statement at ¶ 61. Citing to her affidavit, Plaintiff disputes that she received instructions more than once in July about clearing her schedules before posting deals. She contends that she followed Ms. Cooney's instructions thereafter. *See* Plaintiff's Response at ¶ 61 (citations omitted).

Mr. Guilbeault and Ms. Cooney continued to have conversations about Plaintiff's performance between July 24, 2019, and August 20, 2019. *See* Defendants' Statement at ¶ 62 (citation omitted). In August 2019, Mr. Guilbeault and Ms. Cooney had a conversation in which they both decided that termination of Plaintiff's employment was necessary because of "Plaintiff's failure to understand her role and duties, her failure to perform, and her continued issues with debits and credits." *See id.* at ¶ 63 (citations omitted). Plaintiff responds that Mr. Guilbeault relied on Ms. Cooney's assessment of her performance and not on any of his own observations. *See* Plaintiff's Response at ¶ 63 (citations omitted). She also contends that her performance was not deficient and that she "consistently checked with the banks before reissuing any checks in August 2019. *See id.* Although Plaintiff admits that "there may have been" problems with checks issued in "the winter or spring of 2019," she contends that "they were minor issues that were easily fixable, and which typically did not prompt discipline or termination when done by other employees." *See id.* at ¶ 64 (citations omitted).

---

[16] Plaintiff did not respond to this statement. The Court has verified that the record contains these statements and will accept them as true.

Defendants allege that Ms. Cooney became aware in August 2019 that Plaintiff had reissued a number of checks without following proper protocol. *See* Defendants' Statement at ¶ 64 (citation omitted). These errors cost the dealership more than two thousand dollars. *See id.* Plaintiff disputes that she made any such errors in August 2019. *See* Plaintiff's Response at ¶ 64 (citation omitted).

Ms. Cooney sent an email to Melinda Stoute in the ER Department on August 23, 2019. *See* Defendants' Statement at ¶ 65 (citations omitted). She advised Ms. Stoute that "she wished to proceed with" firing Plaintiff. *See id.* Ms. Cooney attached documents to demonstrate the "issues that Plaintiff had continuously been having [with] her job performance, with the request for termination write up to document some of those issues that Plaintiff [had] and show why the decision was made to terminate" her. *See id.* at ¶ 66 (citations omitted). Plaintiff denies that the attached documents "actually supported the reason for termination or justified termination." *See* Plaintiff's Response at ¶ 66. She contends that ER "officials" "testified that Ms. Cooney provided only two examples of checks with alleged problems . . . and there is no evidence in the record to suggest that any member of management (like Mr. Guilbeault) or employee relations sought to independently confirm or verify" Ms. Cooney's "allegations" or the two checks attached to the request for termination. *See id.* (citations omitted). Officials simply relied on Ms. Cooney's claims. *See id.* Beau Fitzsimmons, an ER employee, reviewed the request and completed supporting documentation. *See* Defendants' Statement at ¶ 67 (citations omitted). He prepared the ECN for termination using Ms. Cooney's information. *See id.* Plaintiff points out that Mr. Fitzsimmons relied on Ms. Cooney's information and did not make an independent investigation. *See* Plaintiff's Response at ¶ 67 (citations omitted). The ER manager, Gina Morse,

reviewed the packet and did not object or raise concerns about terminating Plaintiff.  *See id.* at ¶ 68.

Defendants also allege that Plaintiff took more than three weeks of vacation between beginning her job in October 2019 and July 2019.  *See* Defendants' Statement at ¶ 69 (citations omitted).  Defendants allege that Plaintiff did not have that vacation time and that "she frequently put in time off requests that were at the very last minute."  *See id.*  Defendants also contend that "Plaintiff was never disciplined for taking time off."  *See id.* at ¶ 70.  Plaintiff's failure to provide adequate notice when she needed to take time off, Defendants claim, created "an ongoing problem for the Carbone Yorkville Honda store because coverage was needed" in Plaintiff's department.  *See id.* (citations omitted).  Plaintiff denies that she made last-minute requests.  *See* Plaintiff's Response at ¶ 69 (citation omitted).  She also points out that employees were not required to remind managers that they had scheduled days off.  *See id.* at ¶ 70 (citation omitted).

Defendants allege that "Plaintiff was ultimately terminated because she was not right for the role, was not doing her job correctly and was missing a lot of items which was a problem because her job required very specific duties, which Plaintiff repeatedly could not accomplish despite specific instructions."  *See* Defendants' Statement at ¶ 71 (citations omitted).  Plaintiff denies that her work failed to meet Defendants' Standards.  *See* Plaintiff's Response at ¶ 71 (citation omitted).  She also alleges that Ms. Cooney had frequently praised her performance. *See id.* (citation omitted).

Defendants further contend that one cause of Plaintiff's termination was her repeated failure "to check with the banks to see if the first checks were cashed before issuing second checks[.]"  *See* Defendants' Statement at ¶ 72 (citations omitted).  That failing "cost the company

money." *See id.*  Plaintiff denies that she failed to check with banks before writing a second

check. *See* Plaintiff's Response at ¶ 72 (citation omitted).  Defendants admit that Michelle

Jackson, another employee, had also issued a duplicate check in similar circumstances. *See*

Defendants' Statement at ¶ 73.  This was, however, "only one small check." *See id.*  Plaintiff, by

contrast, "had issued multiple second checks – one of which was for over two thousand dollars –

where she did not check with the bank or follow proper protocol prior to issuing a second

check." *See id.* (citation omitted).  Defendants claim that these multiple instances, along with

other performance issues, led to Plaintiff's firing. *See id.*  Plaintiff contends that Ms. Jackson had

performance issues that were more serious than those she had and was given more written

warnings than she was and was not fired. *See* Plaintiff's Response at ¶ 73 (citations omitted).

Although Defendants acknowledge that "Plaintiff had reached out to the ER department claiming

that someone had requested a check with her name on the request" and that Plaintiff did not

make that request, Mr. Guilbeault testified that he was unaware of the allegations at the time of

Plaintiff's firing and did not consider the request in making the decision to fire Plaintiff. *See*

Defendants' Statement at ¶ 74 (citation omitted).

    The ECN that Plaintiff received before her filing laid out that "Plaintiff had previously

been counseled for these issues, that she was not following the processes and procedures

requested, and that her job duties were not getting done in a timely manner, despite the repeated

training and counseling." *See id.* at ¶ 75 (citations omitted).  Plaintiff admits that the document

stated those reasons for termination but disputes that those reasons were accurate or justified.

*See* Plaintiff's Response at ¶ 75 (citations omitted).

    Ms. Cooney testified to her process for disciplining and terminating employees. *See*

Defendants' Statement at ¶¶ 76-81.  Ms. Cooney also testified that she had fired about ten

employees in the thirty years she worked for Baierl Auto, a company Defendants acquired.  *See id.* at ¶ 76.  After Lithia acquired Baierl, Ms. Cooney fired another four employees.  *See id.*  She contends that all of those workers lost their jobs for "performance problems."  *See id.* (citation omitted).  Plaintiff disputes that all of the firings came because of performance issues.  *See* Plaintiff's Response at ¶ 76 (citations omitted).  Ms. Cooney testified that she would first address an employee's performance issues by "verbally coaching" the employee, "sitting with them, going over tasks step by step," and "discussing what needed to be corrected."  *See id.* at ¶ 77.  If repeated coaching failed to solve the problem, Ms. Cooney "would verbally discipline" the person.  *See id.* at ¶ 78 (citation omitted).  Ms. Cooney further testified that, if these warnings failed to produce results, she would then issue an ECN.  *See id.* at ¶ 79 (citation omitted).  If the problems persisted after the ECN, Ms. Cooney testified that she would fire the employee.  *See id.* at ¶ 80 (citation omitted).  She testified that she followed the practice over the length of her career.  *See id.* at ¶ 81 (citation omitted).

Ms. Cooney testified, however, to one instance where she issued more than one written ECN.  *See id.* at ¶ 82.  The employee involved in that incident was Michelle Jackson.  *See id.*  Ms. Cooney testified that the reasons that Michelle Jackson received two written warnings was "because the incident for which she was first written-up" ended up not being Jackson's fault.  *See id.*  According to Ms. Cooney, Ms. Jackson's first ECN was never issued.  *See id.*  Thus, the second ECN in Ms. Jackson file was actually the first one issued to her.  *See id.* (citation omitted).  Pointing to various evidence, Plaintiff contends that "no communication or document indicating that Ms. Cooney formally rescinded the discipline issued to Michelle Jackson" exists.  *See* Plaintiff's Response at ¶ 82.  Plaintiff points to testimony from Ms. Stoute and Mr. Guilbeault to argue that Defendants do not have evidence that Ms. Cooney formally rescinded

the ECN.  *See id.* (citations omitted).  Plaintiff points out that Ms. Jackson was not fired when

she received the second ECN related to her performance.  *See id.*

Mr. Guilbeault testified that he could not recall any specific employee who received

multiple ECNs before being terminated.  *See* Defendants' Statement at ¶ 84 (citation omitted).

Plaintiff points to testimony from Mr. Guilbeault that indicates that Defendants had multiple

types of discipline that the company could use and could issue multiple written warnings before

firing an employee.  *See* Plaintiff's Response at ¶ 84 (citations omitted).[17]  Mr. Guilbeault also

testified that Defendants had fired three out of four other individuals who had been identified as

having performance problems between June and August 2019.  *See* Defendants' Statement at ¶ 85

(citation omitted).  Plaintiff argues that the mere existence of these individuals does not indicate

that she was treated the same way as the others and argues that Ms. Jackson received more than

one written warning and was not fired.  Gia D'Agostino "was possibly given up to two [ECNs]

for their ongoing performance issues, and despite the performance issues continuing" was not

fired.  *See* Plaintiff's Response at ¶ 85 (citations omitted).  Defendants also allege that Plaintiff

did not inform her supervisor before she left on a planned vacation and that this disrupted the

dealership's planned inventory.  *See* Defendants' Statement at ¶¶ 87-88 (citations omitted).  She

also failed to complete her required tasks before leaving, Defendants contend.  *See id.* at ¶ 90

(citation omitted).

---

[17] Plaintiff points to Mr. Guilbeault's deposition in support of this claim.  *See* Dkt. No. 32-38,
Guilbeault Deposition, at 351.  Plaintiff's counsel asked: "whether sometimes a progressive
process of multiple warnings, including multiple written warnings, was utilized.  So I'm not
talking about a mandatory – 100 – percent-of-the time situation.  Just sometimes was that the
case?"  *See id.*  Mr. Guilbeault answered: "Sometimes that may have been the case."  *See id.*

The Court finds that Defendants have offered legitimate, non-retaliatory reasons for their employment decision.  *See Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (stating that "[o]nce the plaintiff has established a prima facie showing of retaliation, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action" (citing *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011)).  Defendants have offered evidence that Plaintiff failed to meet performance standards, made costly errors in processing checks, and did not respond to attempts at training.  Such conduct provides a basis outside of Plaintiff's protected activity for Defendants' employment action.  *See id.* (stating that "the defendant has proffered the plaintiff's poor work performance, bad behavior, and Andalex's change in business focus as the legitimate non-retaliatory reasons for the Plaintiff's termination").  At this point, "[t]he plaintiff must . . . come forward with [evidence that the defendant's proffered, non-retaliatory reason] is a mere pretext for retaliation."  *Id.*  While in these circumstances, "a plaintiff alleging retaliation . . . must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision," such "'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive."  *Id.* at 845-46 (citation omitted).

"A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, non-retaliatory reasons for its action.  *Id.* at 846.  A reasonable jury that finds such discrepancies "could conclude that the explanations were a pretext for prohibited reason."  *Id.* (citations omitted).  Plaintiff points to several factors which she argues indicate pretext: the close temporal proximity between Plaintiff's protected activity and her

dismissal; weaknesses in Mr. Acosta's investigation, including his failure to interview any witnesses or the accused harassers and alleged failure to follow usual practices; Mr. Acosta's findings in the investigation, where he did not interview any witnesses yet concluded that Plaintiff's claim was not substantiated; Defendants' failure to take any action to halt the harassment; Ms. Cooney's alleged failure to report Plaintiff's claims of harassment in the winter and summer of 2019 to Employee Relations; instances of discipline and alleged changes in Ms. Cooney's assessment of Plaintiff's performance after Plaintiff engaged in protected activity; the ECN issued to Plaintiff, which she alleges was vague and conclusory and did not provide detail; and Defendants' willingness to accept Ms. Cooney's reports of Plaintiff's performance rather than do any investigation into her alleged failings.  Plaintiff also alleges that her termination did not follow Ms. Cooney's usual practice, as Ms. Cooney did not provide any verbal warnings or discipline before issuing the ECN; and the fact that other employees who did not engage in protected activity, like Michelle Jackson, were not terminated.

Defendants contend that the evidence does not support a finding that Ms. Cooney failed to follow her usual practice but instead shows that she conformed to the procedures she typically used when firing: some coaching, then a written warning, and then firing.  Moreover, Defendants did not deviate from any usual practice in accepting Ms. Cooney's evaluation of Plaintiff's performance.  Defendants also insist that Plaintiff was not treated differently than other employes when she was fired with only one written warning; Ms. Jackson's situation was different, and other employees were fired after a single warning.

The Court finds that a reasonable jury could conclude, based on the record as a whole, that there are "weaknesses, implausiblities, inconsistencies, or contradictions in the employer's proffered legitimate, non-retaliatory reasons for [Defendants'] action" in firing Plaintiff.  *Kwan*,

737 F.3d at 846. The record outlined above, drawing all inferences in Plaintiff's favor, provides evidence from which a reasonable jury could find that Defendants did not undertake a serious investigation of Plaintiff's claims, that Mr. Acosta misreported Plaintiff's allegations, that Defendants treated employees who had not complained differently than they did Plaintiff, and that evaluations of Plaintiff's performance changed after she complaint. Although the Court would find that Plaintiff had not produced sufficient evidence of pretext if she relied on a claim that Defendants did not follow a clearly outlines process of progressive discipline – that Plaintiff has not produced any evidence to indicate that Defendants had such a mandatory system in place – the Court concludes that the other evidence outlined above is sufficient to permit a jury to evaluate Plaintiff's retaliation claims. Therefore, the Court denies Defendants' motion for summary judgment with regard to both Plaintiff's Title VII and state-law retaliation claims.

### E.    Punitive damages

Defendants seek summary judgment with regard to any punitive damages claims. They argue that punitive damages are unjustified in this case because there is no evidence that demonstrates the malice or indifference to federally protected rights that justify such damages. Plaintiff responds that she is entitled to punitive damages because the evidence indicates that Defendants failed to take any corrective action for the harassment she suffered and failed to investigate the claims made about her performance deficiencies.

"Punitive damages are '"a discretionary moral judgment" that the defendant has engaged in conduct that is so reprehensible that it warrants punishment.'" *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 115 (2d Cir. 2015) (quoting *Tolbert [v. Queens College]*, 242 F.3d [58,] 77 [(2d

Cir. 2001)] (quoting *Smith v. Wade*, 461 U.S. 30, 52, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983))).

Plaintiff must produce different evidence to sustain punitive damages than to demonstrate

liability. *See id.* "Rather, punitive damages may be awarded for claims of employment

discrimination only where the employer 'engaged in a discriminatory practice or discriminatory

practices with *malice or reckless indifference* to the federally protected rights of an aggrieved

individual.'" *Id.* (quoting 42 U.S.C. § 1981(b)(1)). Thus, "punitive damages are appropriate only

'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it

involves reckless or callous indifference to the federally protected rights of others.'" *Id.* (quoting

*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536, 119 S. Ct. 2118, 144 L. Ed. 2d 494 (1999)

(quotation marks omitted)). "'A plaintiff may establish the requisite state of mind for an award of

punitive damages with evidence (1) that the defendant discriminated in the face of a perceived

risk that its actions violated federal law, or (2) of egregious or outrageous acts that may serve as

evidence supporting an inference of the requisite evil motive.'" *Id.* (quoting *United States v.

Space Hunters, Inc.*, 429 F.3d 416, 427 (2d Cir. 2013) (parenthetical omitted)).[18]

    The Court denies Defendants' motion for summary judgment with regard to the issue of

punitive damages at this time. Whether or not the issue of punitive damages should be presented

to the jury will depend on all of the evidence presented at trial. At the close of the trial, prior to

the Court's providing instructions to the jury, the parties may raise this issue with the Court.

---

[18] "The NYSHRL does not provide for punitive damages." *Syrnik v. Polones Constr. Corp.*, 918 F. Supp. 2d 262, 265 (S.D.N.Y. 2013).

### III. CONCLUSION

Having reviewed the entire file in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment, *see* Dkt. No. 32, is **GRANTED in part and DENIED in part**.  The motion is **GRANTED** with regard to any disability discrimination claims Plaintiff raises under the ADA or the NYSHRL and **DENIED** in all other respects.[19]

**IT IS SO ORDERED.**

Dated:  March 28, 2024
          Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge

---

[19] The Court will contact counsel in the near future to set a date for the trial of the remaining claims in this action.